**DECLARATION OF SPECIAL AGENT JOSEPH D. CREMEENS**

I, Joseph D. Cremeens, Special Agent (SA) of Homeland Security Investigations (HSI), assigned to the Raleigh Resident Agent in Charge Office of HSI, pursuant to 28 U.S.C. § 1746 and the laws of the United States, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

**INTRODUCTION**

1. This declaration is made in support of a complaint to forfeit funds previously seized from multiple virtual currency addresses (VCAs) (collectively, the "SUBJECT VIRTUAL CURRENCY ADDRESSES" or SVCAs). These addresses held proceeds of a cryptocurrency confidence investment fraud scheme, and the funds in them were used to conceal the nature, source, ownership, and control of those proceeds.

2. A cryptocurrency confidence investment fraud scheme is a scheme whereby one or more criminal fraudsters contacted the victims through social media and dating applications to develop relationships that eventually turned romantic in nature. Once trust was established, the criminal fraudster recommended cryptocurrency investments by touting their own, or an associate's, success in the field. The majority of the victims were directed to a fake investment platform hosted on a website. These websites, and the fake investment platforms hosted there, are created by criminals to mimic legitimate platforms.

3. The criminal fraudsters assisted the victims with opening a cryptocurrency account, often on a U.S.-based exchange such as Kraken, Binance, Crypto.com, or OKX, and then walked the victims through transferring money from a bank account to that cryptocurrency account. The victims then received instructions on how to transfer their cryptocurrency assets to the fake investment platform. On its surface, the platforms showed lucrative returns, which incentivized



GOVERNMENT EXHIBIT A

further investment; underneath, all deposited funds were routed to a cryptocurrency VCA controlled completely by criminals.

4. The victims were allowed to withdraw some of their "profits" early in the scheme to engender trust and help convince victims of the legitimacy of the platform. As the scheme continued, victims were unable to withdraw their funds and were provided various excuses as to why. For example, the criminals stated taxes or fees must be paid on the proceeds generated from the platform, which was a final effort by the criminals to elicit more money from victims. This method also disincentivized further withdrawals due to some victims' inability to pay the costly fees. Ultimately, victims were either locked out of their fake investment platform accounts or the platform and website shut down completely, and the victims lost all their funds.

## DECLARANT'S BACKGROUND AND EXPERTISE

5. I am a Special Agent employed with the United States Department of Homeland Security (DHS), Homeland Security Investigations (HSI) assigned to the HSI Raleigh, North Carolina field office (HSI-Raleigh). I have been a certified Special Agent with HSI since 2021. During this time, I have been assigned to numerous criminal investigations involving complex financial crimes and crimes facilitated through the Internet. I am currently assigned to the Eastern District of North Carolina's Illicit Finance Task Force and am responsible for investigations involving complex financial crimes and third-party money laundering, including those involving cryptocurrency. Over my career, I have participated in the execution of numerous warrants involving the search and seizure of computers, computer equipment, and electronically stored information. In addition to my work experience, I have received specialized training in the field of cryptocurrency investigations from HSI, and others. I am a graduate of the Criminal Investigator Training Program (CITP), the Uniformed Police Training Program (UPTP), and Homeland

Security Investigations Special Agent Training (HSISAT) program at the Federal Law Enforcement Training Center (FLETC). Prior to reporting for assignment at HSI-Raleigh, I was a sworn law enforcement officer with the United States Secret Service (USSS) from 2008-2010. Thereafter, from 2010-2016, I was a federal contractor for a classified customer with a focus in counterterrorism. Then, from 2016-2020, I investigated money laundering, fraud, and elder financial exploitation at Wells Fargo and LPL Financial.

**PURPOSE OF THE DECLARATION**

6. I make this declaration in support of the civil forfeiture of the proceeds of a criminal scheme to defraud G.M., D.R., D.C., I.C., E.M., and other victims, executed in violation of 18 U.S.C. §§ 1343 and 1349, and of property involved in or traceable to transactions in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Specifically, this declaration supports the civil forfeiture of the following assets that were previously seized and brought into constructive government custody on the following dates:

a. **May 19, 2025:**

i. 1,430,804 USDT virtual currency (formerly held in address 0x8412372a5d7af4aa5deeac5d94bc797052cfdf4c; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 1**)

ii. 1,637,363.41659 USDT virtual currency (formerly held in address 0x728355da7f81fb80f23525d208321154de86949d; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 2**)

iii. 1,978,017.71 USDT virtual currency (formerly held in address 0x7621c52d926074fcce3f4e2476f4e418efca2387; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 3**)

b. **July 29, 2025:**

i. 1,386,673.725514 USDT virtual currency (formerly held in address 0xc0073e2b93a246f487840bac4169dea349e36dc3; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 4**)

ii. 0.604309 USDT virtual currency (formerly held in address TM2xwqYoZwPyYzhUhuDmedWDNBER2vYDQr; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 5**)

iii. 509,010.011 USDT virtual currency (formerly held in address TULpmhRVU8xoigVM9aJpgRQ4KE1BSS8Cvf; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 6**)

iv. 131,055.440616 USDT virtual currency (formerly held in address TJKHjdGm4jo5uASZGJB2BNVTt61ADoYtbX; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 7**)

v. 231,110.127094 USDT virtual currency (formerly held in address TCX6cjQ34oVm7GCab6cd4Zy6T79uWUpJzo; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 8**)

vi. 714,671.000033 USDT virtual currency (formerly held in address TAEZXb921aw2EuQPCPLG7vvLiA6zLxD2jy; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 9**)

vii. 45,112.856729 USDT virtual currency (formerly held in address TCoBf1bqvh7JYp5ne7CTBgNfvdv3K8z7cG; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 10**)

viii. 26,429.348211 USDT virtual currency (formerly held in address TPp2eyjc8y2LRcji4QegJXNCGuQbpRdtzY; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 11**)

ix. 2,000,355.535412 USDT virtual currency (formerly held in address TYgzvERrsGXeyKVXEjzrTEwaSiw3SV8DyT; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 12**)

x. 3,243,978.459465 USDT virtual currency (formerly held in address TAKaZtkQMyzg2osiLoDbUu7MtTMJTUgZmy; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 13**)

c. **September 17, 2025:**

i. 6,499,970.7 USDT virtual currency (formerly held in address TM2xwqYoZwPyYzhUhuDmedWDNBER2vYDQr; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 5**)

ii. 334,844.28 USDT virtual currency (formerly held in address 0x5f784ebc4ab697206bfc8df42eafb73fdda39a44; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 14**)

iii. 1,370,734.54 USDT virtual currency (formerly held in address 0x42bb168d6c042b68709b2142243c0e205fdd1b8d; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 15**)

iv. 40,256,642.09 USDT virtual currency (formerly held in address 0x51DC0d08A01CE128897B200bc47639ffaA9Ca8d5; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 16**)

d. **February 19, 2026:**

i. 2,566,418.83 USDT virtual currency (formerly held in address 0xe779240e80ab513675b318baf8a9554808eb5acb; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 17**)

ii. 226,694.0251 USDT virtual currency (formerly held in address 0x3881add1ede17d0eed41b728f1afbb49067d7ed9; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 18**)

iii. 5,000,000.02 USDT virtual currency (formerly held in address 0xf946a9c1ae8370c568a3eb94a863e797f1b7563f; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 19**)

iv. 2,000,000.02 USDT virtual currency (formerly held in address 0x7896be22e9d71a9b9caf4226145d1670dacafeec; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 20**)

v. 2,000,000.02 USDT virtual currency (formerly held in address 0xa447766dc12ff3ea21c4772b42fbb6d8b6245024; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 21**)

vi. 2,000,000.02 USDT virtual currency (formerly held in address 0x98f11df3f5275e205731787e8556bc4925715f0f; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 22**)

vii. 26,116,755.400219 USDT virtual currency (formerly held in address 0xf3bfc88b752cfc435fcda87fb4119e80dadba3eb; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 23**)

viii. 500,000.043232 USDT virtual currency (formerly held in address 0x7a15afff7a3cafefb3fe80e5f4c4028d68c2fadf; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 24**)

ix. 500,000.016099 USDT virtual currency (formerly held in address 0x07bcd67cefdd8b7062006a67fca954d38cef5a25; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 25**)

x. 303,938.0053 USDT virtual currency (formerly held in address 0x14ad3f15779766307a8743ef45dda92871bdeeca; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 26**)

xi. 609,475.26 USDT virtual currency (formerly held in address 0x9a1fb45deadd3bd8bb5c9e7bb20a67942cd40f7c; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 27**)

xii. 917,067.48 USDT virtual currency (formerly held in address 0xdf0675e74db5beb006846c4dc4c7f23e8bcea890; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 28**)

xiii. 233,822.74 USDT virtual currency (formerly held in address 0x7e85d72aa6da1dd91a4c38180ac3686bcb006754; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 29**)

xiv. 698,309.010709 USDT virtual currency (formerly held in address 0x2a977b2a3c1296dc7d00838ad522f3051a02804d; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 30**)

xv. 3,225,238.008261 USDT virtual currency (formerly held in address 0xbaea957390e503f60b3db0ebea9bfd5a4fab9435; Hereafter referred to as **SUBJECT VIRTUAL CURRENCY ADDRESS 31**)

7. The listed amounts are the amounts actually seized at the time each seizure warrant was served on Tether, which may differ from the balances stated in the underlying seizure warrant applications. The list totals approximately 108,694,492.743893 USDT.

8. As explained below, the foregoing funds represent traceable criminal proceeds which were derived from a criminal fraud scheme that successfully defrauded multiple victims by luring them to fake investment platforms, inducing them to invest in cryptocurrency, and directing them to transfer cryptocurrency to wallets controlled by the fraudsters.

## SEIZURE AND CUSTODY OF THE DEFENDANT PROPERTY

9. The USDT described above was seized pursuant to four seizure warrants issued by United States Magistrate Judges of the Eastern District of North Carolina: (a) Case No. 5:25-MJ-1625-BM, issued in May 2025, as to SUBJECT VIRTUAL CURRENCY ADDRESSES 1 through 3; (b) Case No. 5:25-MJ-1946-RN, issued on or about July 25, 2025, as to SUBJECT VIRTUAL CURRENCY ADDRESSES 4 through 13; (c) Case No. 5:25-MJ-2194-KS, issued on or about September 17, 2025, as to SUBJECT VIRTUAL CURRENCY ADDRESSES 5, 14, 15, and 16; and (d) Case No. 5:26-MJ-1267-JG, issued on or about February 19, 2026, as to SUBJECT VIRTUAL CURRENCY ADDRESSES 17 through 31.

10. In each instance, Tether International S.A. de C.V. ("Tether"), the issuer of USDT, first froze the USDT held at the address at the request of law enforcement. Because Tether will not freeze an address that does not hold USDT, virtual currency addresses identified in the tracing

described below that held no USDT balance at the time of the respective applications were not included among the SUBJECT VIRTUAL CURRENCY ADDRESSES.

11. Each warrant was transmitted to Tether, which froze the USDT tokens then associated with the address. The frozen USDT is maintained by Tether for their mandatory 90-day hold prior to the USDT being "burned" (that is, destroyed) and reissued as an equivalent amount of USDT to a virtual currency wallet controlled by the United States. The seized USDT has remained in the actual or constructive custody of the United States since the dates set forth above.

12. With respect to **SUBJECT VIRTUAL CURRENCY ADDRESS 5**, Tether was unable to freeze the address until several days after the July 2025 seizure warrant issued, and withdrawals from that address occurred during that interval. As a result, only 0.604309 USDT was seized on July 29, 2025. The address thereafter received the further transfers from WJ described below, and was seized a second time, in the amount of 6,499,970.7 USDT, on September 17, 2025.

13. Consolidation address 0x7e92ab3ce6eb7cd7d4b1ff085d6da35d9b1a4acc ("**4acc**") is referred to throughout this declaration but is not among the SUBJECT VIRTUAL CURRENCY ADDRESSES. It was not seized because it never held USDT for any substantial period of time; it functioned as a primary consolidation wallet through which scam proceeds passed on their way into the addresses that were in fact seized.

## BACKGROUND OF CRYPTOCURRENCY

14. **Blockchain:** A blockchain is a digital ledger run by a decentralized network of computers referred to as "nodes." Each node runs software that maintains an immutable and historical record of every transaction utilizing that blockchain's technology. Many digital assets, including virtual currencies, publicly record all their transactions on a blockchain, including all of the known balances for each virtual currency address on the blockchain. Blockchains consist of

blocks of cryptographically signed transactions, and blocks are added to the previous block after validation and after undergoing a consensus decision to expose and resist tampering or manipulation of the data. There are many different blockchains used by many different virtual currencies. For example, Bitcoin in its native state exists on the Bitcoin blockchain, while Ether (or "ETH") exists in its native state on the Ethereum network.

15. **Virtual Currencies** are digital representations of value that, like traditional coin and paper currency, function as a medium of exchange (i.e., they can be digitally traded or transferred and can be used for payment or investment purposes). Virtual currencies are a type of digital asset separate and distinct from digital representations of traditional currencies, securities, and other traditional financial assets. The exchange value of a particular virtual currency generally is based on agreement or trust among its community of users. Some virtual currencies have equivalent values in real currency or can act as a substitute for real currency, while others are specific to particular virtual domains (e.g., online gaming communities) and generally cannot be exchanged for real currency. Cryptocurrencies, like Bitcoin and ETH, are types of virtual currencies, which rely on cryptography for security. Cryptocurrencies typically lack a central administrator to issue the currency and maintain payment ledgers. Instead, cryptocurrencies use algorithms, a distributed ledger known as a blockchain, and a network of peer-to-peer users to maintain an accurate system of payments and receipts.

16. **Stablecoins** are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, USDT is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

17. **Tether**: Tether International S.A. de C.V. ("Tether") is the company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens.

18. **TRON (or Tron)** is a blockchain for creating decentralized applications. Unlike similar blockchain projects, TRX (the native TRON token) itself is not used on the chain to pay transaction fees. TRON transactions require both Bandwidth points and Energy to measure network usage instead of charging direct gas fees in TRX. On Tron, all transaction types consume bandwidth points. Transactions are transferred and kept on the network in a byte array and the bandwidth points used for a transaction are equal to the size of its byte array. The more data required by the user means more usage of a byte array and therefore the transaction fees are higher. For example, if the byte array is 200 this means that the fee will be 200 bandwidth points. The larger the transaction, the more bandwidth resources will be consumed. TRON Energy is a blockchain resource used to pay for the computer processing time required to run smart contracts, such as transferring TRC-20 tokens like USDT. If the account lacks sufficient Bandwidth or Energy, TRX needs to be burned from the sending account to cover the costs of the transaction.

19. A **smart contract** is a computer program stored on a blockchain that executes automatically when the conditions written into its code are satisfied. Once a smart contract is deployed to a blockchain, its code is generally fixed, and transactions it executes are recorded on the public ledger and cannot be reversed by the parties to them. Smart contracts are the mechanism by which blockchains support assets other than the network's own native currency: a "token" such as USDT is not a separate blockchain but a smart contract running on an existing one, which maintains the ledger of who holds how many tokens. USDT is issued in this manner on multiple blockchains, including as an ERC-20 token on the Ethereum network and a TRC-20 token on the Tron network. Because a transfer of USDT is executed by calling that smart contract rather than

by simply moving the network's native currency, such transfers consume the computational resources described below— "gas" on Ethereum and "energy" on Tron—and therefore cost more than a transfer of the native currency alone.

20. **USDT** is a blockchain-based cryptocurrency whose tokens in circulation are backed by an equivalent amount of U.S. dollars, making it what is known as a "stablecoin." USDT is issued by Tether. USDT is hosted on the Ethereum and Tron blockchains, among others.

21. A **Virtual Currency Address** is an alphanumeric string that designates the virtual location on a blockchain where virtual currency can be sent and received. A virtual currency address is associated with a virtual currency wallet.

a. Like other virtual currencies, USDT is sent to and received from USDT "addresses." A USDT address is somewhat analogous to a bank account number and is represented as a 46-to 48-character-long case-sensitive string of letters and numbers. Users can operate multiple USDT addresses at any given time, with the possibility of using a unique USDT address for every transaction.

b. Although the identity of a virtual currency address owner is generally anonymous (unless the owner opts to make the information publicly available), analysis of the blockchain can often be used to identify the owner of a particular address holding USDT. The analysis can also, in some instances, reveal additional addresses controlled by the same individual or entity.

22. **Private Key:** A private key is a cryptographic key used to authorize transactions from a virtual currency address. Possession of the private key allows control over the virtual currency associated with the address.

23. **Public Key:** A public key is a cryptographic key derived from a private key and intended to be shared publicly. In many blockchain systems, a virtual currency address is derived from a public key.

24. A **Virtual Currency Wallet** (e.g., a hardware wallet, software wallet, or paper wallet) stores a user's public and private keys, allowing a user to send and receive virtual currency stored on the blockchain. Multiple virtual currency addresses can be controlled by one wallet.

25. A **Hardware Wallet** is a physical, removable device that stores a user's private keys and can be connected to a computer when a user wishes to use the keys stored on the wallet for virtual currency transactions. Hardware wallets can be secured with PINs and passphrases and can be backed up or regenerated with a recovery phrase. Trezor and Ledger are some examples of the types of hardware wallets on the market.

26. A **Hosted Wallet**, also known as a custodial wallet, is a virtual currency wallet through which a third party, e.g., a virtual currency exchange, holds a user's private keys. The third party maintains the hosted wallet on its platform akin to how a bank maintains a bank account for a customer, allowing the customer to authorize virtual currency transactions involving the hosted wallet only by logging into/engaging with the third party's platform.

27. **Multi-Signature** (or "multisig") wallets (also sometimes called "multisig vaults" or "safes") require two or more private key signatures to authorize transactions. Multi-signature wallets requiring more than two private key signatures can be designed so a majority of keys are needed to authorize transactions.

28. A **Paper Wallet** is an offline paper record of a virtual currency wallet's public and private keys. Paper wallets can include barcodes (e.g., a QR code) along with their alphanumeric strings. It is literally private keys printed on a piece of paper.

29. A **Software Wallet** is an internet-connected virtual currency wallet in the form of a software application on a desktop or mobile device or a web-based platform accessible through a web browser. The software will store and usually encrypt the user's public and private keys.

30. An **Unhosted Wallet**, also known as a self-hosted or non-custodial wallet, is a virtual currency wallet through which the user has complete control over storing and securing their private keys and virtual currency. Unhosted wallets do not require a third party's involvement (e.g., a virtual currency exchange) to facilitate a transaction involving the wallet.

31. **Blockchain Analysis**: Blockchain analysis is the examination of the public transaction records of a blockchain, alone and in combination with information obtained from other sources, in order to determine the movement of virtual currency and, in some cases, to identify the persons who control particular virtual currency addresses. A blockchain records the addresses involved in each transaction, the amount transferred, and the date and time of the transfer, but it does not record the name of any person. Attribution therefore does not come from the ledger itself, but from connecting activity recorded on the ledger to records maintained off of it, and from patterns in the on-chain activity that are inconsistent with the independent conduct of unrelated users.

32. A **Virtual Currency Exchange** ("VCE"), also called a cryptocurrency exchange, is a platform used to buy and sell virtual currencies. VCEs allow users to exchange their virtual currency for other virtual currencies or fiat currency, and vice versa. Many VCEs also store their customers' virtual currency addresses in hosted wallets. VCEs can be centralized (i.e., an entity or organization that facilitates virtual currency trading between parties on a large scale and often resembles traditional asset exchanges like the exchange of stocks) or decentralized (i.e., a peer-to-peer marketplace where transactions occur directly between parties).

33. **Back-Tracing**: In back-tracing, instead of tracing forward to find out where the funds were sent, the analyst traces backwards to see what other addresses had sent funds to the consolidation addresses, and where those funds originated. This technique has been found to be very successful in locating additional victims who may not have reported the scam or may not yet be aware they are a victim.

## BACKGROUND ON GAS FEES

34. Transfers of cryptocurrency are subject to transaction costs, and each blockchain maintains its own manner of paying those costs. Transactions conducted on the Ethereum blockchain incur costs known as "gas" or "gas fees." Users pay gas fees to third parties, called validators, who engage with the Ethereum ecosystem to support the transfer of cryptocurrencies worldwide. For Ethereum transactions, gas fees must be paid in ETH, the native cryptocurrency of the Ethereum network. This includes transactions involving Ethereum network tokens, such as USDT, whose outgoing transfers each require gas fees to be paid in ETH and cannot be paid using the USDT tokens themselves. A wallet address therefore must have an ETH balance in order to initiate a sending transaction.

35. On the Tron network, transaction costs are determined differently. Tron transaction costs are primarily determined by Bandwidth points and Energy. Bandwidth is used for basic transactions such as transferring TRX, while energy is needed for more complex operations such as interacting with smart contracts. Every account receives a daily free allocation of bandwidth points; if an account exceeds that allocation, TRX is burned to acquire more bandwidth. Energy is consumed when interacting with smart contracts and, unlike bandwidth, has no free daily allowance; it is obtained by freezing TRX or by paying TRX as a fee. Tron has also introduced

"Tron Gas Free," a mechanism that allows a user to bypass the usual requirement of holding TRX to cover transaction fees, under which a small fee is paid directly in USDT instead of TRX.

36. Because of the nature of gas fees, the payor of the initial gas fees for a given address is commonly associated with, or is the owner or individual manager of, that address.

## ACCOUNTING METHOD FOR THE TRACING OF CRYPTOCURRENCY

37. The LIFO ("Last In, First Out") method is an accounting methodology applied to tracing that assumes the most recently deposited funds into a commingled account are the first to be withdrawn from that account. When withdrawals occur, they are attributed to the most recently deposited funds before being attributed to older deposits. Based on my training and experience, it is reasonable to apply the LIFO method in this case to conclude that the funds in the SUBJECT VIRTUAL CURRENCY ADDRESSES include victim funds and are tied to the cryptocurrency confidence fraud scheme described in this declaration.

38. The LIFO method described above is applied to the tracing of USDT. The analysis of Ethereum gas fee payments set out below is not a tracing analysis and does not depend on LIFO or on any other accounting convention. It is offered to show association and common control among addresses, not to establish that the contents of a particular address are traceable to a particular source.

## ABBREVIATIONS AND CONVENTIONS

39. Abbreviated Virtual Currency Addresses: Throughout this declaration, I introduce a Virtual Currency Address (VCA) using the full address and thereafter will use the last four

characters of the VCA as shorthand to concisely communicate the routing of the transfers between VCAs.

40. Time Zone: All times listed throughout the declaration are in 24-hour format of the UTC time zone, which is the standard display format in TRM Labs' Blockchain Investigations Platform.

## FACTS SUPPORTING FORFEITURE

41. This investigation began with a fraud scheme to steal cryptocurrency from an elderly victim, GM, who resides in the Eastern District of North Carolina, and expanded into the transnational money laundering network described below. The scheme was perpetrated through a romance scam in which the fraudster convinced the victim to invest cryptocurrency in a fake financial investment platform that was under the control of the fraudster. In the course of investigating the fraud perpetrated against GM, HSI Raleigh identified four additional victims: DR, who resides in Maryland; DC, who resides in New Jersey; IC, who resides in Florida; and EM, who resides in California.

## NORTH CAROLINA VICTIM'S REPORT LEADS TO INITIAL SEIZURE OF THREE WALLETS AND DISCOVERY OF THAI CRYPTOCURRENCY FRAUD SCHEME

42. In or about December 2024, GM contacted HSI Raleigh regarding the loss of approximately $30,000 in an apparent romance scam. GM is an elderly retired resident of Knightdale, North Carolina, within the Eastern District of North Carolina.

43. HSI Raleigh conducted an interview of GM on December 16, 2024, and determined that he was the victim of a romance scam and cryptocurrency confidence investment scheme.

44. According to GM, in or around June 2024, GM met an individual via the X social media platform who claimed to work for a creative design firm in Allentown, Pennsylvania.

Eventually GM began chatting with the individual, known as Ella Huang Siqi (ES) on Telegram and the relationship advanced to romantic in nature.

45. After GM chatted many weeks with ES, ES claimed to have a close family member in New York City who worked in the financial industry and could provide guidance for cryptocurrency investments. GM and ES began discussing cryptocurrency investments more and GM started investing with $5,000.00 USD on or about September 26, 2024. GM was led to believe that he was receiving "good returns" on his investment. To invest, GM sent wire transfers from his personal account at Bank of America to "Crypto.com".

46. From Crypto.com, GM's investment was sent to a Trust wallet where he accessed "XTBEXC.com" through the Trust mobile application's internal web browser. Within the browser, GM could see what appeared to be his cryptocurrency investments, which concentrated in Tether (USDT) and Bitcoin totaling approximately $13,000.00 USD in value, including market gains. These "gains" were a part of a fabricated scheme utilizing an artfully crafted scam website to give GM the impression he had legitimately invested the funds. These false "gains" also assisted in perpetuating the scheme by incentivizing GM to invest more money.

47. Review of "XTBEXC.com" showed it to be an attempt to mirror XTB.com. XTB is an international online trading platform that allows users to trade stocks, ETFs, and foreign currency exchange. Logos for the "XTBEXC.com" are substantively similar to XTB's. However, the real XTB platform does not allow true purchasing of cryptocurrencies. XTB allows investing in cryptocurrencies via Contracts for Difference (CFDs), which allows for an individual to speculate on the price movements of the assets versus owning them.

48. Led by ES, the conversation then shifted to increasing GM's investments. After GM's initial investment, ES said that if his investment exceeded $20,000.00 USD in value, ES

could guarantee a greater return. According to GM, he sold other investments and sent another wire for what he believed was $9,500.00 USD to put his total investment with gains at $20,000.00 USD. Review of wire activity showed that the wire transfer sent at the time referenced by GM was $13,750 to his Crypto.com account on October 22, 2024.

49. GM requested to withdraw money out of the investment and was told by customer service at "XTBEXC.com" that he would need to pre-pay for taxes prior to any withdrawal. The tax amount needed was approximately $11,200.00 USD.

50. GM sent a wire transfer to his Crypto.com account for $11,200.00 USD and sent 11,353 USDT to "XTBEXC.com". However, in an effort to get additional funds from GM, "XTBEXC.com" representatives stated that the amount was over what GM owed, and he needed to send the exact amount, which was the $11,200.00 USD.

51. During this time, GM found another X profile utilizing a picture of ES, but under the name "Emily Karima".

52. Consistent with other cryptocurrency confidence investment scams, when GM attempted to withdraw his earnings, he was advised that he would have to pay taxes on the balance. GM advised investigators he had previously used funds from his personal account, credit cards, and even took out personal loans for the investments. The additional request from "XTBEXC.com" stating that GM had overpaid for taxes and therefore needed to send another wire for an exact amount of taxes is yet another tactic in fraud schemes to extract money from victims. Furthermore, GM advised investigators that at one point the individual sent money back to him, which is also a consistent tactic in cryptocurrency confidence fraud scams to entice the victims to invest larger amounts.

53. Based on information provided by GM, investigators traced an October 22, 2024, withdrawal in the amount of approximately $13,316 in Bitcoin from Crypto.com to **1BAmnjonQ4MtoEshJuVGWeXUkgE2h7ZjRC** "(**ZjRC**)." From "**ZjRC**", investigators traced the entirety of the $13,316 from GM's crypto.com account to **SUBJECT VIRTUAL CURRENCY ADDRESS 1**. Specific tracing for this transaction is included starting at paragraph 58.

54. Based on GM's report of the cryptocurrency confidence investment scam for which he was a victim, investigators identified additional victims from virtual currency exchanges Coinbase and Crypto.com, who sent over $2,000,000 in cryptocurrency to wallets with activity indicative of cryptocurrency confidence schemes. Of the identified probable victims, four victims were cooperative with law enforcement and provided facts confirming that they were indeed targeted as part of a cryptocurrency confidence investment scam. These additional victims are referred to as DR, DC, IC, and EM.

## MOVEMENT OF FUNDS TO SUBJECT VIRTUAL CURRENCY ADDRESS 1

55. Investigators identified approximately five addresses holding USDT involved in the movement of funds from GM's Crypto.com account to **SUBJECT VIRTUAL CURRENCY ADDRESS 1.** These five addresses holding USDT are referred to as intermediary addresses, that is addresses through which the funds passed on their way to their ultimate destination, in this case, **SUBJECT VIRTUAL CURRENCY ADDRESS 1**, where the funds remained until they were seized.

56. The flows of funds from scam address "**ZjRC**" to **SUBJECT VIRTUAL CURRENCY ADDRESS 1** showed several unique indications that those transactions originated from a cryptocurrency confidence investment fraud scheme and other frauds. For instance, the

numerous intermediary addresses used to funnel funds from scam address "**ZjRC**" to **SUBJECT VIRTUAL CURRENCY ADDRESS 1** were active in similar time frames between 2024 and 2025. The accounts exhibited large dollar deposit transactions, followed by a pattern of rapid movement of funds with large corresponding withdrawals. Five of the wallets in the flows received and sent transactions worth over $1 billion in cryptocurrency.

57. Based on my training and experience, I know that criminals will often conduct an otherwise unnecessary (if the transactions were legitimate) and costly number of transactions in the transfer of funds to layer ill-gotten funds to ultimately conceal or disguise the nature, location, source, ownership, or control of those proceeds. The large number of rapid transfers—with no apparent business purpose—in transactions throughout this case is a strong indication that the movement of funds was performed in a manner meant to conceal or disguise the nature, location, source, ownership, or control of the proceeds of a specified unlawful activity (in this case, wire fraud).

58. The following chart, which is also attached to this declaration in larger format as **Graph Exhibit 1**, summarizes the tracing outlined in the subsequent paragraphs of this section:




59. Between October 22, 2024, and November 4, 2024, there were a series of transactions from an address associated with Crypto.com to "**ZjRC**"– the address to which GM was directed.

60. On October 22, 2024, around 22:55, the equivalent of approximately $13,316 in Bitcoin was transferred from an address associated with Crypto.com to "**ZjRC**." The timing and amount of this transaction is consistent with the funds sent by GM to "**ZjRC**" as directed by the scammers.

61. On October 22, 2024, around 23:43, the equivalent of approximately $13,303 in Bitcoin was transferred from "**ZjRC**" to **0x975401a0e9b4645f18436f6fd95a6d6cb0ad99ce** ("**99ce**") and exchanged for USDT via the Decentralized Finance Bridge known as ThorSwap[1].

62. On October 27, 2024, around 06:56, the equivalent of approximately $21,032 in USDT was transferred from "**99ce**" to **0x5a0492079f0d76def94eeeb40c58c70adb7bc06a** ("**c06a**"). This transaction contained USDT traceable to GM which had been commingled with other USDT suspected to have been derived from the cryptocurrency confidence investment scam.

63. On October 28, 2024, around 05:36 the equivalent of approximately $525,815 in USDT was transferred from "**c06a**" to **0xcd9041ec910984e5f670fbf5e13b567b17f3f73a** ("**f73a**"). This transaction contained USDT traceable to GM which had been commingled with other USDT suspected to have been derived from the cryptocurrency confidence investment scam.

64. I identified "**f73a**" as a consolidation address that is explained further in this declaration.

65. On October 28, 2024, around 14:35, the equivalent of approximately $481,127 in USDT was transferred from "**f73a**" to **0x383fa093f947ed2a4bef13d1f63b4005adcb87de** ("**87de**").

66. On October 30, 2024, around 11:36, the equivalent of approximately $395,992 in USDT was transferred from "**87de**" to **0x340217f26cfd7fbc97869502867cb6dc378dd2da**

[1] ThorSwap enables cryptocurrency to chain swap to new blockchains.

("**d2da**"). This transaction contained USDT traceable to GM which had been commingled with other USDT suspected to have been derived from the cryptocurrency confidence investment scam.

67. On November 1, 2024, around 02:32, the equivalent of approximately $703,162 in USDT was transferred from "**d2da**" to **0x7e92ab3ce6eb7cd7d4b1ff085d6da35d9b1a4acc** ("**4acc**"). This transaction contained USDT traceable to GM which had been commingled with other USDT suspected to have been derived from the cryptocurrency confidence investment scam.

68. On November 4, 2024, around 07:33, the equivalent of approximately $711,257 in USDT was transferred from "**4acc**" to **0x8412372a5d7af4aa5deeac5d94bc797052cfdf4c** ("**df4c**") aka **SUBJECT VIRTUAL CURRENCY ADDRESS 1** where the funds remained until seized by HSI Raleigh. This transaction contained USDT traceable to GM which had been commingled with other USDT suspected to have been derived from the cryptocurrency confidence investment scam.

## ADDITIONAL VICTIM PROCEEDS TRACED TO SUBJECT VIRTUAL CURRENCY ADDRESS 1

69. As set forth above, in addition to GM, investigators identified four additional victims from virtual currency exchanges Coinbase and Crypto.com, who reportedly sent over $2,000,000 in cryptocurrency to wallets whose activity is indicative of cryptocurrency confidence fraud schemes.

70. All victims explained contact with individuals online that is indicative of cryptocurrency confidence schemes. In every circumstance the victims reported that the scammer brought up topics of investing in cryptocurrency via a family member in the financial industry. Once the investments were sent to the scammers, the victims' attempts to withdraw funds from their investment accounts were met with forced tax payments and fees that were required to be paid directly to the scammers through artfully crafted web portals that resembled legitimate online

cryptocurrency exchanges. The first victim was the party who initially reported the activity to HSI and is mentioned above as GM.

## CALIFORNIA VICTIM

71. The second victim was identified after the back-tracing of **SUBJECT VIRTUAL CURRENCY ADDRESS 1**. Based on interviews by investigators, the second victim, identified as EM, explained that he was contacted via Facebook messenger by an Annaliese Kaltenberg (AK).

72. Their relationship turned romantic in nature, and they chatted for months before she mentioned website "bitfarms.top" as a crypto trading platform that EM should review for potential investments.

73. According to EM, AK worked as an Investor for Equinox Fitness and lived in New York City. AK had a close family member who worked in finance in New York City and would allegedly provide guidance on the best times to invest in cryptocurrency.

74. EM detailed 5 cryptocurrency transfers totaling approximately $1,500,000 USD from October 29, 2024, to December 12, 2024, that were investments through the "bitfarms.top" platform. Approximately $44,800 of the reported $1,500,000 from EM was traced to **SUBJECT VIRTUAL CURRENCY ADDRESS 1**.

75. When EM attempted to withdraw funds from the investment, the scammers would not allow a withdrawal unless the "taxes" were prepaid directly to the "bitfarms.top" trading platform.

## NEW JERSEY VICTIM

76. The third victim was also identified after back-tracing of **SUBJECT VIRTUAL CURRENCY ADDRESS 1**. Based on interviews by investigators, the third victim, identified as DC, explained that he was contacted via Twitter by 4 separate individuals perpetrating similar

versions of the same scam. DC met all 4 scammers through Twitter, and messaging eventually switched to Telegram. Each scammer brought up cryptocurrency investment opportunities through a family member, usually an aunt or uncle. Each provided DC with a website or app used to track his individual investments.

77. The individuals scamming DC went by the names Daisy, Cheng, Ella, and Dewi. The websites and platforms provided to DC were "cit-invest.com", a "PYTH" mobile application, "jsxyf.com", and "xtbexc.com".

78. The individual operating as Ella is likely the same user who scammed victim 1, GM. The individual used the same name, hometown of Allentown, PA, the profile image appeared the same, and they provided the same scam platform of "xtbexc.com".

79. DC stated to investigators that he sent approximately $150,000 in virtual currency to the individuals perpetrating this cryptocurrency confidence investment scheme, $15,102 of which was traced into **SUBJECT VIRTUAL CURRENCY ADDRESS 1**.

## MARYLAND VICTIM

80. The fourth victim was also identified after back-tracing **SUBJECT VIRTUAL CURRENCY ADDRESS 1**. Based on an interview with investigators, the fourth victim, identified as DR, explained that he was contacted via Facebook by a female named "Agnes Brown" purporting to be a Romanian national residing in Los Angeles, California.

81. DR and "Agnes Brown" chatted for months on Facebook and Telegram, and their relationship turned romantic in nature. DR explained that he and "Agnes Brown" met in a Facebook group he was utilizing while working through his recent divorce. DR noted that "Agnes Brown" indicated to him that she was also recently divorced.

82. Eventually, "Agnes Brown" mentioned a family member in New York that could assist them with investing in cryptocurrency by timing the market. "Agnes Brown" mentioned the website and mobile application "Goldrushtrader" and "GRTrader" as a crypto trading platform and mobile application that DR should review for potential investments. DR explained that the trading platform changed three times while he was "investing" cryptocurrency with the scammers. The other two platforms utilized by "Agnes Brown" to perpetuate the scam against DR were "Tshanmarkets" and "aleogmgolden.com."

83. DR explained that in order to conduct these investments guided by "Agnes Brown", cryptocurrency payments were necessary because the markets he was attempting to access were internationally based and required cryptocurrency.

84. DR attempted to withdraw funds from the "aleogmgolden.com" platform in order to pay his 2025 taxes and was met with requirements to pay approximately $68,000 in fees before his funds could be withdrawn.

85. DR stated to investigators that he sent approximately $500,000 in virtual currency to the individuals perpetrating this cryptocurrency confidence investment scheme, $78,700 of which was traced into **SUBJECT VIRTUAL CURRENCY ADDRESS 1**.

## FLORIDA VICTIM

86. Through back-tracing from **SUBJECT VIRTUAL CURRENCY ADDRESS 1**, investigators identified another victim, identified as IC. IC is elderly, a retiree, and a recent widower, which, based on my experience, is a typical target of individuals perpetrating this type of scam. IC was interviewed via telephone and explained that he had been the victim of a scam involving cryptocurrency investments. IC stated that he was contacted via Facebook by a female who eventually expressed romantic interest in IC. This individual recommended website

"Bitchen.com" as a cryptocurrency investment platform. IC described that he was able to make small withdrawals from the account early on in the scam, but when he attempted to make a larger withdrawal, the scammers required that he pay $650,000 in taxes. IC was unsure of the exact amount he invested but knew it was over $600,000. In addition to the $600,000, he admitted that he also took a loan from the scammers in the amount of $300,000 which he also paid back to them. Of the over $900,000 IC admitted to having provided the scammers, $44,903 can be traced into **SUBJECT VIRTUAL CURRENCY ADDRESS 1**.

## CONSOLIDATION OF VICTIM SCAM PROCEEDS

87. Between October 20, 2024, and October 31, 2024, approximately 196,821 USDT of GM, IC, DC, DR, and EM's cryptocurrency transfers to the scam-affiliated wallet addresses were deposited and consolidated into intermediary address **0xcd9041ec910984e5f670fbf5e13b567b17f3f73a** ("**f73a**").

88. From "**f73a**", 440,000 USDT was transferred in 2 transactions to "**87de**" on Oct 21, 2024, 13:16 and Oct 31, 2024, 11:26. These transactions contained USDT traceable to GM, IC, DC, DR and EM which had been commingled with other USDT suspected to have been derived from the cryptocurrency confidence investment scam.

89. From "**87de**", 310,372 USDT was transferred in 2 transactions to "**d2da**" on Oct 22, 2024, 13:38 and Oct 31, 2024, 13:01. These transactions contained USDT traceable to IC, DC, DR and EM which had been commingled with other USDT suspected to have been derived from the cryptocurrency confidence investment scam.

90. From "**d2da**", 708,074 USDT was transferred to "**4acc**" on Nov 1, 2024, 02:32. This transaction contained USDT traceable to IC, DC, DR and EM which had been commingled

with other USDT suspected to have been derived from the cryptocurrency confidence investment scam.

91. From "**4acc**", 708,074 USDT was transferred to **SUBJECT VIRTUAL CURRENCY ADDRESS 1** on Nov 4, 2024, 07:33. This transaction contained USDT traceable to IC, DC, DR and EM which had been commingled with other USDT suspected to have been derived from the cryptocurrency confidence investment scam.

92. Previously, but during the overall scam activity period, wallet address "**4acc**" also transferred 525,826.34 USDT on August 6, 2024, at 16:21 to **SUBJECT VIRTUAL CURRENCY ADDRESS 2.**

93. In addition to the $196,821 traceable to GM, IC, DC, DR, and EM contained in **SUBJECT VIRTUAL CURRENCY ADDRESS 1**, the other funds present in **SUBJECT VIRTUAL CURRENCY ADDRESS 1** appear to be the proceeds of fraud in that they bear indicia of cryptocurrency confidence investment fraud schemes.

94. The following chart, which is also attached to this declaration in larger format as **Graph Exhibit 2**, provides a visualization of paragraphs 87 to 91.




**<u>LINKED VIRTUAL CURRENCY ADDRESSES VIA LARGE TRANSACTIONS AND "GAS FEES"</u>**

95. I identified virtual currency addresses likely owned and/or operated by the same owner or owners of **SUBJECT VIRTUAL CURRENCY ADDRESSES 1-4** based on the movement of ETH used to fund the transaction costs of withdrawing the USDT on the Ethereum blockchain. These transaction fees or "gas fees" are the payment or fee required for the wallets to conduct an outgoing transaction. While **SUBJECT VIRTUAL CURRENCY ADDRESS 4** was seized after **SUBJECT VIRTUAL CURRENCY ADDRESSES 1-3**, it is mentioned in this

section because the alleged owner of SVCAs 1-3 reported that they are also the owner of SVCA 4. The analysis below appears to corroborate this information.

96. As illustrated in **Graph Exhibit 4**, the Gas Fees chain of events for **SUBJECT VIRTUAL CURRENCY ADDRESSES 1-4** began at VCA **0xc507b39fcce0da7dae0d77c78d5acdeaba6cc72f** ("**c72f**"), which received its initial funding from a Bangkok-based VCE called Satang Corp, DBA *Orbix Trade Company Limited (Orbix).* KYC information provided by Orbix shows a mixture of two individuals. Specifically, a Thai National ID in the name of an individual identified herein as SF, but the account registered under the name of an individual identified herein as SK. Both sections of KYC documentation have different dates of birth and Thai National IDs.

97. I have seen similar circumstances to this among others identified in this case that are believed to be perpetrating the investment fraud scheme. Specifically, a Thai national identified herein as PM, referenced throughout this declaration and more thoroughly introduced in paragraph 126, has her identity document being used by her son, SM, who is the actual user of the VCAs. SM's name is the registrant of the Binance account under the ID document of his mother, PM. I have received separate Binance KYC information showing that SM maintains at least 1 other Binance account solely registered under his name and ID.

98. VCA "**c72f**", noted in paragraph 96, received its initial gas funding in March 2021. In March 2022, a Thai national identified herein as TN, the claimed owner of **SUBJECT VIRTUAL CURRENCY ADDRESSES 1-4,** provided the gas fees that initiated the specific ETH funding down the line to **SUBJECT VIRTUAL CURRENCY ADDRESSES 1-4.** In most cases, the ETH is deposited into the VCA, the USDT was deposited and withdrawn from the VCA, and any remaining ETH is moved on to the next wallet believed to be owned and/or operated by those

perpetrating the cryptocurrency confidence fraud scheme. Those remainders are what make their way to funding the gas fees for **SUBJECT VIRTUAL CURRENCY ADDRESSES 1-4**. The gas fees required to withdraw the funds and move them through the intermediate addresses are moved along the chain of VCAs with the scam derived USDT until they arrived at **SUBJECT VIRTUAL CURRENCY ADDRESSES 1-4**.

99. TN claims to own **SUBJECT VIRTUAL CURRENCY ADDRESSES 1-4** and directly funded gas fee payments that route to the **SUBJECT VIRTUAL CURRENCY ADDRESSES 1-4.** En route to **SUBJECT VIRTUAL CURRENCY ADDRESSES 1-4,** the gas fee ETH transfers also fund gas fees for known fraud consolidation wallet **"4acc".**

100. Specifically, unhosted wallet **0x35d6b72ebe461940e534c0854c7016ac9cbed25b** ("**d25b**"), which received the equivalent of around $156,761 in USDT downstream from scam address "**87de**", paid the Gas Fees for wallet "**4acc**", the USDT from this downstream transfer ended up in **SUBJECT VIRTUAL CURRENCY ADDRESS 1.**

101. Separately, in advance of the transaction involving scam proceeds from victim GM, wallet address "**4acc**" sent 525,826.34 USDT, the equivalent of around $528,139 to VCA **0x728355da7f81fb80f23525d208321154de86949d** "**949d**" aka **SUBJECT VIRTUAL CURRENCY ADDRESS 2** on August 6, 2024, at or around 16:21.

102. The 525,826.34 USDT transferred from "**4acc**" to **SUBJECT VIRTUAL CURRENCY ADDRESS 2** on August 6, 2024, at or around 16:21 followed a pattern transfer pattern similar to **SUBJECT VIRTUAL CURRENCY ADDRESS 1** with multiple transfer hops, and consolidation at **"4acc".**

103. Specifically, **SUBJECT VIRTUAL CURRENCY ADDRESS 2** received the 525,826.34 USDT from "**4acc**" on August 6, 2024. This transfer is ultimately sourced to over 50

transfers from VCE Binance totaling over 1.4 million USDT. The majority of these transfers occurred in July and August 2024 and consolidated with other similar transfers from VCE Binance into VCA **0x02c907553f3af182a14c08e63132d3d75a1563a0** ("**63a0**"). From "**63a0**", the transfers fund three transfers totaling 1,858,000 USDT.

a. The first transfer was for 568,000 USDT on July 22, 2024, at 06:11 into **0xf70c4dccb07bde0ca23fc4a99311f1869fc91e0e** ("**1e0e**").

b. The second transfer was for 710,000 USDT on July 25, 2024, at 20:23, also into "**1e0e**".

c. The third transfer was for 600,000 USDT on August 8, 2024, at 13:50 into **0xf670c0f3509c74b38a1de04876e38c42e327c459** ("**c459**"). This 600,000 USDT funds a 580,000 USDT transfer into "**1e0e**" on August 9, 2024, at 14:33.

104. From "**1e0e**", 1,827,945 USDT is transferred in three separate transactions for 558,192 USDT on July 22, 2024, at 23:43, 698,324 USDT on July 26, 2024, at 06:17, and 571,429 USDT on August 10, 2024, at 06:30, to VCA **0xaca9949dc36f334cf7cc84847278555602b231eb** ("**31eb**")

105. From "**31eb**", the funds split across three separate VCAs in four transfers.

a. In the first and second transfers, VCA **0x3de6b5ca8dab6fb98d2bd1ad5aad485f862cd084** ("**d084**") received 2 transfers from "**31eb**": 1 for 162,479.34 USDT on July 22, 2024, at 17:28, and 659,324 USDT on July 26, 2024, at 13:02.

i. These transfers as well as other funds in "**d084**", commingled with 140,924 USDT in "**d084**" sourced to a Thai national identified herein as MP and funded a single withdrawal for 1,025,826.34 USDT into "**4acc**".

This 1,025,826.34 directly funded the 525,826.34 (referenced starting at paragraph 92) USDT transfer from known scam consolidation wallet "**4acc**" into **SUBJECT VIRTUAL CURRENCY ADDRESS 2.**

ii. In addition to the transfer of 525,826.34 USDT from **"4acc"** into **SUBJECT VIRTUAL CURRENCY ADDRESS 2,** the 1,025,826.34 USDT deposit into "**4acc**" also funded a withdrawal from "**4acc**" of 500,000 USDT on August 3, 2024 into VCA **0x522d0ed13753a1bcc0ae51bfd53eae59b0243234** ("**3234**"). VCA "**3234**" was identified in TRM systems as reportedly involved in a cryptocurrency confidence fraud scheme.

b. In the third transfer, VCA **0xa8ee9632c0c629a73a3b7c4d30410d77737a4f7b** ("**4f7b**") received 328,333 USDT from "**31eb"** on August 5, 2024, at 15:07.

i. From "**4f7b**", the 328,333 USDT is commingled with other funds, and 466,675 USDT was transferred to **0x2e18c263186818a416822c1435f478514f3d0740** ("**0740**") on August 10, 2024, at 14:52.

c. In the fourth transfer, VCA **0x882ae57977fe375e783c7d71d8df19c794e62bdf** ("**2bdf**") received 655,367 USDT from "**31eb"** on August 10, 2024, at 13:01.

i. In "**2bdf**", the 655,367 USDT commingled with other funds, and 1,136,850 USDT was transferred to "**0740**" on August 10, 2024, at 14:52.

ii. The two transfers into **"0740"** for 1,136,850 USDT and 466,675 USDT totaling 1,603,525, funded a single transfer of 1,600,000 USDT to **SUBJECT VIRTUAL CURRENCY ADDRESS 2.**

106. **SUBJECT VIRTUAL CURRENCY ADDRESS 2**'s Gas Fees were paid by wallet **0x4230c373d7fb2baf854fed235819ca962ed87960** ("**7960**"). Wallet "**7960**" also paid the Gas Fees for **SUBJECT VIRTUAL CURRENCY ADDRESS 3**.

107. The owner of wallet addresses "**4acc**" and "**d25b**" paid some of the initial gas fees for wallet **0xc3dbad415d1fa4b56f8ff1f40e43c401045a9ea3** ("**9ea3**") along with VCAs **0xcf3f7b849fe3ed85bab16461d9fc7828e66afb1c** ("**fb1c**") and **0x835950bb6cf5fc78ea6968d1e8055c365922d21b** ("**d21b**").

a. VCA "**d21b**" also had its initial gas funding from "**d25b**".

b. VCA "**fb1c**" received its initial gas funding from VCA **0x4230c373d7fb2baf854fed235819ca962ed87960** ("**7960**").

c. VCA "7960" paid the initial gas fees for **SUBJECT VIRTUAL CURRENCY ADDRESSES 2 and 3.**

108. Separately, in a single transaction conducted on or about July 9, 2024, 508,269.71 USDT, worth approximately $505,717 was transferred from wallet "**d25b**" ("**d25b**" is introduced in paragraph 100) to **0x7621c52d926074fcce3f4e2476f4e418efca2387** "**2387**" aka **SUBJECT VIRTUAL CURRENCY ADDRESS 3.**

109. On May 26, 2024, between 07:02 and 08:06, **SUBJECT VIRTUAL CURRENCY ADDRESS 3** received ten (10) transfers from VCE Binance for 149,994 USDT each, totaling 1,499,940 USDT.

110. These transfers are sourced to accounts at VCE Binance for ten (10) different Thai nationals. Each Thai national received two deposits: one deposit for 1,000 USDT on May 25, 2024, between 16:53 and 16:56; and another deposit for 149,000 USDT on May 26, 2024, between 06:48 and 06:52. Each Thai national received 150,000 USDT and sent 149,994. Each Thai national appears to have been paid 6 USDT to conduct the transfers.

111. The withdrawals from the Thai nationals to **SUBJECT VIRTUAL CURRENCY ADDRESS 3** were completed within minutes of receiving the 150,000 USDT deposits and in almost the exact amounts received. This pattern is similar to the use of funnel accounts by drug trafficking organizations at traditional financial institutions. I identified no legitimate purpose for distributing equal deposits among 10 different individuals, only for those individuals to then re-consolidate the same funds into a single wallet.

112. Given that **SUBJECT VIRTUAL CURRENCY ADDRESS 1** contains funds directly traceable to victims GM, IC, DR, DC, and EM, that **SUBJECT VIRTUAL CURRENCY ADDRESS 2** received deposits sourced to activity indicative of a crypto confidence fraud scheme from the same scam consolidation wallet (**"4acc"**) as **SUBJECT VIRTUAL CURRENCY ADDRESS 1**; that **SUBJECT VIRTUAL CURRENCY ADDRESS 3** received deposits from another consolidation wallet ("**d25b**") which in turn paid the gas fees to open **"4acc"**; and that the same individual is funding and claiming ownership of SVCAs 1-4; there is a reasonable basis to conclude that all VCAs involved in the similar movement of funds to **SUBJECT VIRTUAL CURRENCY ADDRESSES 1-4** are being utilized for the purposes of laundering the proceeds from the cryptocurrency confidence fraud scheme. The interconnected gas fee payments among these VCAs corroborates this belief.

113. Comparing Graph Exhibits 3 and 4 shows that the gas fee payments align with the movement of USDT from victims GM, IC, DC, DR, and EM through intermediate addresses to **SUBJECT VIRTUAL CURRENCY ADDRESSES 1-3.**

114. The following chart, which is also attached to this declaration in larger format as **Graph Exhibit 3**, explains the links between **SUBJECT VIRTUAL CURRENCY ADDRESSES 1-4** that appear to be associated with or owned by or managed by the individual or individuals perpetrating the cryptocurrency confidence fraud scheme outlined in this Declaration. Due to the nature of Gas Fees, it is common that the payor of the fees is associated with or the owner or individual manager of a particular address who is attempting to initiate the transaction.



115. The following chart, which is also attached to this declaration in larger format as **Graph Exhibit 4**, shows the movement of funds used to pay transaction fees by the reported owner of **SUBJECT VIRTUAL CURRENCY ADDRESSES 1-4** and another set of individuals believed to be involved in the cryptocurrency confidence fraud scheme.



116. Based on Gas Fee analysis and analysis of the flow of funds from this cryptocurrency confidence fraud scheme, **SUBJECT VIRTUAL CURRENCY ADDRESSES 1-4** are all linked directly via Gas Fees and/or large transfers of cryptocurrency believed to be proceeds from a cryptocurrency confidence fraud scheme.

117. The USDT seized from **SUBJECT VIRTUAL CURRENCY ADDRESSES 1-3** consisted of a mixture of identified victim proceeds and other funds believed to be involved in the laundering of scam proceeds. This belief is based on the unnecessary and costly movement of USDT through multiple wallets and individuals before the funds were ultimately consolidated into the "**4acc**" wallet and other consolidation wallets. Some of the transfers believed to be associated with money laundering were traced to multiple Thai nationals, who were identified through information provided by virtual currency exchanges Binance and OKX.

118. Information provided by Binance and OKX showed that these Thai nationals received frequent, large cryptocurrency deposits into their wallets, often from the same source address on a different blockchain, and then quickly transferred those funds to wallets affiliated with the cryptocurrency investment fraud scam under investigation.

## BACK-TRACING FROM KNOWN SCAM CONSOLIDATION WALLET "4ACC" TO IDENTIFY ADDITIONAL BAD ACTORS AND FORWARD TRACING TO THEN IDENTIFY WALLETS BELIEVED TO BE USED TO MOVE AND LAUNDER SCAM PROCEEDS

119. VCA "**4acc**", already known and established to be a scam consolidation wallet that received and sent scam victim derived funds, continued to be prevalent in the movement of scam-affiliated cryptocurrency transfers. As a result, I conducted extensive tracing and back-tracing of "**4acc**" to identify further scam activity and to identify additional victims of the cryptocurrency investment scam.

120. In or about June 2025, my back-tracing of "**4acc**" identified the noted five victims (GM, DR, DC, IC, and EM) as well as eighteen Virtual Currency Addresses (VCAs) believed to be affiliated with a large-scale cryptocurrency confidence scam that emanates out of Thailand and Cambodia.

121. The eighteen VCAs transmitted over 190 million in USDT believed to be sourced solely to cryptocurrency confidence fraud schemes perpetrated by the same organized crime group, as described later in this declaration.

122. These VCAs are hosted wallets at VCEs Binance and OKX, which allowed me to conduct further investigation to identify the users of the wallets by requesting the Know Your Customer (KYC) information from the VCEs themselves.

123. Tracing forward from the eighteen VCAs identified **SUBJECT VIRTUAL CURRENCY ADDRESSES 4 - 13**, which held over 9 million in USDT believed to be sourced solely to cryptocurrency investment fraud.

124. I submitted requests to Virtual Currency Exchanges (VCEs) Binance and OKX and received Know Your Customer (KYC) data for the eighteen VCAs. Binance and OKX KYC documentation provided the names, addresses, phone numbers, email addresses, IP addresses,

location data, and IDs used to create the VCAs with the exchanges. Each VCA was linked to a Thai national, which was substantiated by the ID and other information provided by Binance and OKX.

125. Based on my review of the transactional activity within the eighteen VCAs, they appear to be used as pass-through wallets to obfuscate the source of the deposited cryptocurrency, effectively laundering what are believed to be proceeds from investment fraud scams. Of those eighteen, I focused on two of the most prolific of these Thai nationals, Miss Wannisa JUNTARASIGNHAN ("WJ") and Mrs. P. Parichat MATCHIM ("PM"), who were identified from the KYC data provided by Binance and OKX.

126. HSI Bangkok's Transnational Criminal Investigative Unit (TCIU), a vetted unit comprised of Royal Thai Police Investigators, provided information that the Thai national known as PM, was under investigation by Thai authorities. The investigation into PM by Thai authorities concerned multiple criminal complaints from Thai victims that PM, among others, was perpetrating an investment fraud scheme. Transactional review of PM and WJ's activity at VCEs Binance and OKX revealed intertwined cryptocurrency transfers, which I believe further corroborates that all funds emanating from PM and WJ were sourced to the cryptocurrency confidence fraud scheme.

127. By way of example only, PM and WJ are listed as the owners of accounts at Binance and OKX. Starting in April 2025, PM and WJ transferred Binance Bridged USDT (BSC-USD), a token representing USDT on the blockchain known as Binance Smart Chain, from Binance. After taking multiple hops through unhosted wallets, the transfers routed to VCA **0x5f784EBc4Ab697206BFC8Df42EAfb73FdDA39A44** (**"9a44"**) (identified as a consolidation

wallet of what are believed to be scam proceeds) and ultimately returning to wallets that PM and WJ control at Binance.

a. At Binance, PM and WJ swap the BSC-USD for USDT on the Tron network (changing blockchains) and then transfer the USDT to wallets owned by PM and WJ at OKX.

b. From OKX, PM and WJ transferred the funds back to "**9a44**" on the Ethereum blockchain.

c. From "**9a44**", a large portion of the transfers take multiple hops, routed through known scam consolidation address "**4acc**" and ended at **SUBJECT VIRTUAL CURRENCY ADDRESS 4**. The transfers from OKX into "**9a44**" are included in **Graph Exhibit 5**. The transfers from Binance to "**9a44**" are included in **Graph Exhibits 6 and 7**.

d. According to Binance, the source of the initial transfers of BSC-USD that route to "**9a44**" are hundreds of transfers utilizing a Binance Cloud platform. This platform is provided by Binance, allowing smaller entities to launch digital asset exchanges quickly by using Binance's existing infrastructure. Due to this, I did not have access to the KYC and transactional information for these specific transactions.

## DECLARANT TRAVELS TO THAILAND TO FURTHER INVESTIGATE CRYPTOCURRENCY FRAUD SCHEME

128. Given the significance of Thai nationals uncovered during the investigation, I traveled to Bangkok, Thailand in July 2025 to brief the Royal Thai Police's Central Investigation

Bureau (CIB), Technology Crime Suppression Division (TCSD) on the findings from the HSI Raleigh investigation to date.

129. CIB TCSD officials stated that the fraud scam was likely being operated out of the border region of Thailand and Cambodia, an area known to CIB TCSD for the operation of well-organized scam call centers. CIB TCSD officials noted that the call centers are predominantly owned/managed by members of Chinese organized crime groups and are often staffed by both voluntary and involuntary employees whose primary functions are to perpetrate scams against victims worldwide.

130. CIB TCSD explained that the centers perpetrating these scams accessed the internet from both sides of the Thailand and Cambodia border depending on the internet service provider being used at the time. The information provided by CIB TCSD was corroborated using returns from Binance that showed the VCAs associated with the Thai nationals (referenced starting in paragraph 124) were accessed from IP addresses located in Thailand and Cambodia as well as China, and Turkey.

131. IP address information provided by Binance and OKX showed the VCAs were accessed from Thailand, Cambodia, China, and Turkey sometimes minutes apart, revealing that multiple individuals must be accessing the VCAs from different international locations at any given time. This information supports an inference that the activity I identified is associated with cryptocurrency investment fraud schemes.

132. Additionally, according to information provided by Thai CIB, the inclusion of Turkish IP addresses combined with Chinese, Thai, and Cambodian IP addresses is also indicative of the operations managed by Chinese organized crime groups. CIB explained that the leaders of these Chinese organized crime groups have been actively pursuing Turkish residency and travel

documents via the Turkish Citizenship by Investment (CBI) Program. According to CIB, their efforts to pursue Turkish travel documents was for two main reasons: Turkish passports have easier travel through European countries, allowing for greater investment opportunities and holding dual passports adds a layer of difficulty in tracking travelers.

133. According to CIB, the scam centers themselves are operated by Chinese organized crime like a sales business. Leads are provided to a low-level employee who initiates contact with the potential victim. If a response is received from a potential victim, they are transferred to an individual relationship manager who builds rapport and ultimately swindles the victim into providing cryptocurrency in furtherance of the scam. I have been able to corroborate this information based on alerts set up to monitor activity from the **SUBJECT VIRTUAL CURRENCY ADDRESSES**. Activity in the VCAs aligns with the time zone of Thailand and Cambodia and therefore alerts are received during what would be normal business operating hours in each, i.e. 8am-6pm. However, no alerts were received on weekend days and nights, strengthening CIB's information that the scam center operates as a business and has hours that reflect "core hours".

134. According to CIB, the centers have multiple floors split up based on language targets, e.g. Spanish on floor 1, English on floor 2, etc. Those relationship managers are recruited from around the world to support language needs and brought on site to the centers located at the Thailand and Cambodia border. When they are recruited, these individuals are not aware of the scam and are brought in under the guise of working another job. However, once working at the facility they are aware of the scam.

135. According to CIB, the individuals are paid, with some staying voluntarily. Others brought in are held against their will, sometimes having their passports taken to prevent travel.

136. According to CIB the centers look like commercial office parks but are surrounded by fencing to keep the workers inside.

137. CIB explained that the Chinese management is closely aligned with the "finance office" of the individual scam center and often directs the movement of funds. As corroborated by my tracing of the funds, CIB explained that the fraudsters attempt to withdraw the scam proceeds through Virtual Currency Exchanges (VCEs) and financial institutions across multiple currencies, including physical gold.

138. CIB stated that the organized crime groups also own electronics recycling businesses that are used to launder the proceeds from the scams. These recycling businesses remove small traces of gold used in the circuitry of the electronics as a normal course of business. The gold purchased with scam proceeds is then commingled with the gold being recycled to effectively launder the funds through their business.

## ADDITIONAL INVESTIGATION FOCUSED ON TRANSACTIONS INVOLVING PM AND WJ

139. As part of this investigation, I continued to trace and backtrace transactions that were conducted with known scam consolidation address "**4acc**". Identified during the course of this back-tracing were 18 Thai nationals (based on KYC information received from VCEs Binance and OKX) as the owners of VCAs that routed millions in USDT through "**4acc**". Of the 18 Thai nationals identified as potentially involved in the money laundering operations for the cryptocurrency investment fraud scheme, two of the most prolific of the Thai nationals, PM and WJ, stood apart from the larger group based on the volume of transactions and dollar amounts

involved. Specifically, hosted VCAs in the names of PM and WJ received and sent over $50 million in what are believed to be cryptocurrency investment scam proceeds.

140. As previously stated, PM and WJ were identified after back-tracing transfers into known scam consolidation wallet "**4acc**", which was the main consolidation wallet used to commingle the funds stolen from the five positively identified victims of cryptocurrency investment fraud (noted beginning with paragraph 54).

141. PM and WJ share two other consolidation addresses on the Ethereum network, VCAs **0x0dc3fc3399d8e500205135bd2ee8360d93f421fb** ("**21fb**") and "**9a44**". VCA "**9A44**" is also known as **SUBJECT VIRTUAL CURRENCY ADDRESS 14.** The common usage of multiple consolidation wallets is yet another example that these two individuals are linked, likely through their work within a dedicated scam group.

142. PM and WJ also share a consolidation address on the Tron network, **TM2xwqYoZwPyYzhUhuDmedWDNBER2vYDQr** ("**YDQr**"), also known as **SUBJECT VIRTUAL CURRENCY ADDRESS 5.** Line by line tracing for **SUBJECT VIRTUAL CURRENCY ADDRESS 5** begins at paragraph 165.

143. PM and WJ sent over 28 million USDT to **SUBJECT VIRTUAL CURRENCY ADDRESS 5** between February and June of 2025. Approximately 7,290,294 USDT of the 28 million was transmitted in June 2025 alone.

144. PM and WJ sent over 16 million in USDT to consolidation address "**9a44**" from March to May 2025, and over 2 million in USDT to "**21fb**" from March to April 2025.

145. The common usage of multiple consolidation wallets for significant portions of the transfers shows that the group of Thai nationals identified are the likely perpetrators of the same overall cryptocurrency investment fraud scheme. Further, the continued usage of scam

consolidation wallet "**4acc**" by these same individuals shows that the transfers conducted by WJ and PM that route into the **SUBJECT VIRTUAL CURRENCY ADDRESSES** is sourced to the same cryptocurrency investment fraud scheme involving victims GM, DR, DC, IC, and EM.

**<u>THE MOVEMENT OF FUNDS TO SUBJECT VIRTUAL CURRENCY ADDRESS 4</u>**

146. I identified approximately seven intermediary addresses involved in the movement of funds from the associated Thai VCA under the control of PM and WJ to **SUBJECT VIRTUAL CURRENCY ADDRESS 4**. These seven addresses moving USDT are referred to as intermediary addresses, that is addresses through which the funds passed on their way to their ultimate destination, in this case, the **SUBJECT VIRTUAL CURRENCY ADDRESS 4**.

147. The flows of funds from VCE Binance to **SUBJECT VIRTUAL CURRENCY ADDRESS 4** showed several unique indications that those transactions originated from a cryptocurrency confidence fraud scheme, separate and apart from my investigation and information provided by Thai authorities.

a. For instance, seven intermediary addresses were used to funnel funds from the Thai VCAs to **SUBJECT VIRTUAL CURRENCY ADDRESS 4** with funds consolidated at known scam consolidation address **"4acc"** and ultimately transferred into **SUBJECT VIRTUAL CURRENCY ADDRESS 4.**

b. As described beginning in paragraph 141, not only were PM and WJ utilizing multiple intermediary addresses, but the source of their largest transfers are hundreds of small transfers that are consolidated, swapped for a different cryptocurrency, moved to a different blockchain, and routed back into the same consolidation wallet in a circular movement of funds with no apparent legitimate purpose or source.

148. As included in **Graph Exhibit 5**, the first VCAs receiving deposits from PM and WJ were funded via 2 individual transfers from a wallet in the name of PM totaling 1,499,900 USDT. 426,375 USDT from these two transfers were directly traced to **SUBJECT VIRTUAL CURRENCY ADDRESS 4.**

149. The following chart, which is also attached to this declaration in larger format as **Graph Exhibit 5**, shows the movement of funds from PM's Thai-controlled VCA and through previously identified consolidation address **"4acc"** to **SUBJECT VIRTUAL CURRENCY ADDRESS 4**.




150. The following chart, which is also attached to this declaration in larger format as **Graph Exhibit 6**, includes the movement from PM's VCA to **SUBJECT VIRTUAL CURRENCY ADDRESS 4** as well as the intersections with WJ's hosted VCA. Known consolidation wallets are marked in pink.




151. **Graph Exhibit 6** depicts the initial transfers from PM that route to **SUBJECT VIRTUAL CURRENCY ADDRESS 4**, along with PM's 699,900 transfer of USDT to consolidation address **"21fb"**. WJ's 19 transfers, totaling 8,000,081 USDT, which emanated from OKX and were deposited into **"9a44".** While not all transfers route to **SUBJECT VIRTUAL CURRENCY ADDRESS 4**, the fact that these two Thai nationals are sending vast amounts of cryptocurrency to the same VCAs with no apparent legitimate business purpose, strengthens the inference that all of these movements are in an effort to obfuscate the source as proceeds from a cryptocurrency confidence fraud scheme.

152. Based on my training and experience, I know that criminals will often conduct an otherwise unnecessary (if the transactions were legitimate) and costly number of transactions to layer ill-gotten funds to ultimately conceal or disguise the nature, location, source, ownership, or control of those proceeds. The large number of rapid transfers—with no apparent business purpose—in transactions throughout this case is a strong indication that the movement of funds

was performed in a manner meant to conceal or disguise the nature, location, source, ownership, or control of the proceeds of a specified unlawful activity (in this case, wire fraud).

**TRACING TO SUBJECT VIRTUAL CURRENCY ADDRESS 4**

153. As included in **Graph Exhibit 5**, between April 18, 2025, and May 2, 2025, there were a series of transactions from VCAs associated with VCE Binance to **SUBJECT VIRTUAL CURRENCY ADDRESS 4.**

154. On April 18, 2025, around 09:06 and 09:11, 1,499,900 USDT was transferred via two separate transfers from an account at VCE Binance registered to PM to **0x5f784ebc4ab697206bfc8df42eafb73fdda39a44** ("**9a44**").

155. On April 18, 2025, around 09:24, 1,499,900 USDT was transferred from "**9a44**" to consolidation address **0x0dc3fc3399d8e500205135bd2ee8360d93f421fb** ("**21fb**"). Both of these addresses are recipients of USDT from PM and WJ.

156. On April 21, 2025, around 06:42, 686,970 USDT was transferred from "**21fb**" to **0x8a1c1b7f25f389072ada7416c164934f8856a018** ("**a018**").

157. On April 21, 2025, around 06:42, 549,115 USDT was transferred from "**a018**" to **0xac846d879e6f03f90c5e0ff07131b4857ef9213c** ("**213c**").

158. The 549,115 USDT from "**a018**" was split into two transfers, both routing to the same VCA. The first transfer occurred on April 21, 2025, around 15:21, 449,115 USDT was sent from "**213c**" to **0x688afee8ea8ff62ceb7f65818655929b1815f03e** ("**f03e**"). The second transfer was sent on April 22, 2025, around 12:33, for 100,000 USDT from "**213c**" to "**f03e**". In total, all 549,115 USDT transferred to "**f03e**".

159. At "**f03e**", the funds split into two transfers, both routing to the same VCA, totaling 526,375 USDT. The first transfer was completed on April 22, 2025, around 13:09, for 426,375

USDT from **"f03e"** to **0x8f8771e4bead63be637b3505cae335ac1f63f9ae** (**"f9ae"**). The second transfer was sent on April 24, 2025, around 16:09, for 100,000 USDT from **"f03e"** to **"f9ae"**. These transfers commingle with other funds in **"f9ae"**.

160. On May 1, 2025, around 09:59, 764,883.219785 USDT was transferred from **"f9ae"** to known scam consolidation address **"4acc"**.

161. On May 2, 2025, around 12:04, 793,369.219785 USDT was transferred from known scam consolidation address **"4acc"** to **SUBJECT VIRTUAL CURRENCY ADDRESS 4**.

162. Of the original 1,499,900 USDT transferred from the scam-affiliated VCAs, 526,375 USDT can be traced to **SUBJECT VIRTUAL CURRENCY ADDRESS 4**.

**TRACING TO SUBJECT VIRTUAL CURRENCY ADDRESSES 5 TO 15**

163. Based on the linkage of PM's and WJ's transfers to known scam consolidation address **"4acc"** and to the other **SUBJECT VIRTUAL CURRENCY ADDRESSES**, I include below the tracing of **SUBJECT VIRTUAL CURRENCY ADDRESSES 5–15**. That tracing reveals activity similar to what the tracing of **SUBJECT VIRTUAL CURRENCY ADDRESS 4** revealed, including multiple hops to intermediary wallets and the consolidation of proceeds into wallets connected to **SUBJECT VIRTUAL CURRENCY ADDRESSES 5–15**, initiated by wallets under the control of PM and WJ.

164. Based on my experience investigating cryptocurrency confidence fraud schemes, these techniques are consistent with the perpetuation of cryptocurrency confidence fraud schemes and are not consistent with any legitimate personal or business practice.

## SUBJECT VIRTUAL CURRENCY ADDRESS 5 (consolidation address)

165. Between February 16, 2025, and June 18, 2025, I identified 46 transfers totaling 28,973,967.40 USDT, sent by PM and WJ, that consolidated into a single VCA on the Tron network, **SUBJECT VIRTUAL CURRENCY ADDRESS 5**. These 46 transfers comprise:

a. 34 transfers from a wallet affiliated with PM at VCE Binance, conducted between February 16, 2025, and June 14, 2025, ranging from 100 USDT to 1,505,490 USDT and totaling 22,973,995 USDT; and

b. 12 transfers attributed to WJ, conducted on June 18, 2025, totaling 5,999,972.4 USDT.

## WJ's transfers into SUBJECT VIRTUAL CURRENCY ADDRESS 5 and onwards into SUBJECT VIRTUAL CURRENCY ADDRESSES 8, 9, 10, 11, and 12

166. On June 18, 2025, WJ conducted 12 transfers from wallets affiliated with VCE OKX, each in the amount of 499,997.7 USDT, totaling 5,999,972.4 USDT, all of which were deposited into consolidation address **SUBJECT VIRTUAL CURRENCY ADDRESS 5**. These deposits funded a transfer of 2,856,136 USDT, which in turn funded transfers into **SUBJECT VIRTUAL CURRENCY ADDRESSES 8, 9, 10, 11, and 12**.

167. The movement of these funds proceeded as follows. Given the volume of transfer activity, this Declaration provides a sampling of the transfer amounts and summarizes the remaining activity. The activity as a whole is included in **Graph Exhibits 7 and 8**.

a. On July 2, 2025, at approximately 06:08, 2,856,136 USDT was transferred from **SUBJECT VIRTUAL CURRENCY ADDRESS 5** to **SUBJECT VIRTUAL CURRENCY ADDRESS 8**.

b. On July 2, 2025, at approximately 10:32, 250,000 USDT was transferred from **SUBJECT VIRTUAL CURRENCY ADDRESS 8 to** VCA **TMs5yxyirdhrms6Pk6qJrACPP8dtpRnSBq** ("**nSBq**").

c. On July 9, 2025, at approximately 05:52, 196,375 USDT was transferred from **SUBJECT VIRTUAL CURRENCY ADDRESS 8** to **SUBJECT VIRTUAL CURRENCY ADDRESS 9**.

d. On July 10, 2025, at approximately 07:10, 114,912 USDT was transferred from **SUBJECT VIRTUAL CURRENCY ADDRESS 8** to **SUBJECT VIRTUAL CURRENCY ADDRESS 9**.

e. On July 10, 2025, at approximately 10:47, 300,000 USDT was transferred from **SUBJECT VIRTUAL CURRENCY ADDRESS 8** to **SUBJECT VIRTUAL CURRENCY ADDRESS 10**.

f. On July 11, 2025, at approximately 06:31, 50,000 USDT was transferred from **SUBJECT VIRTUAL CURRENCY ADDRESS 8** to **SUBJECT VIRTUAL CURRENCY ADDRESS 10**.

g. On July 11, 2025, at approximately 09:33, 299,900 USDT was transferred from **SUBJECT VIRTUAL CURRENCY ADDRESS 5** to **SUBJECT VIRTUAL CURRENCY ADDRESS 11**.

h. On July 14, 2025, at approximately 04:52, 300,000 USDT was transferred from **SUBJECT VIRTUAL CURRENCY ADDRESS 8** to VCA "**nSBq**"

i. On July 14, 2025, at approximately 16:07, 300,000 USDT was transferred from "**nSBq**" to **TReggQD3iiFo1Tp85k4QUEYE5APV52Kxyz** ("**Kxyz**"), where it was commingled with additional cryptocurrency from other sources.

j. On July 16, 2025, at approximately 10:14, 500,000 USDT was transferred from "**Kxyz**" to **TBRTKTsQBxMitm7LSafn9uZnd1xN54kULe** ("**kULe**").

k. On July 16, 2025, at approximately 11:03, 283,505 USDT was transferred from "**kULe**" to **TWbed6vdYtQmS3Q23gByz6zjRM7ZaU5gZW** ("**5gZW**").

l. On July 16, 2025, at approximately 12:52, 111,244 USDT was transferred from "**5gZW**" to **TCtcVk2DfvGD5M5JoZUwRMj8WZHwz6QF9K** ("**QF9K**").

m. The transfers continue through an additional 31 VCAs before ending in **SUBJECT VIRTUAL CURRENCY ADDRESS 12**. 94,409 USDT can be directly traced from the original 550,000 USDT transferred from **SUBJECT VIRTUAL CURRENCY ADDRESS 8** to VCA **"nSBq"**. This 94,409 USDT is commingled with other funds from transfers totaling over 8,000,000 USDT; as referenced previously in this declaration, there is no legitimate purpose for conducting this many transfers other than to obfuscate the source of the funds.

n. All of the above transfer activity is directly sourced to WJ's 12 transfers into **SUBJECT VIRTUAL CURRENCY ADDRESS 5** on June 18, 2025, as described in paragraph 166.

168. The following chart, which is also attached to this declaration in larger format as **Graph Exhibit 7**, shows the transfers from WJ to **SUBJECT VIRTUAL CURRENCY ADDRESSES 5, 8, 9, 10, and 11.**




169. The following chart, which is also attached to this declaration in larger format as **Graph Exhibit 8**, shows the movement from **SUBJECT VIRTUAL CURRENCY ADDRESS 8** to **SUBJECT VIRTUAL CURRENCY ADDRESS 12**



170. In summary, the specific amounts traced from WJ's 5,999,972.4 USDT, through **SUBJECT VIRTUAL CURRENCY ADDRESS 5**, and to **SUBJECT VIRTUAL CURRENCY ADDRESSES 8, 9, 10, 11, and 12** are as follows:

a. 2,856,136 USDT can be traced to **SUBJECT VIRTUAL CURRENCY ADDRESS 8**;

b. 754,980 USDT can be traced to **SUBJECT VIRTUAL CURRENCY ADDRESS 9**;

c. 350,000 USDT can be traced to **SUBJECT VIRTUAL CURRENCY ADDRESS 10**;

d. 299,900 USDT — transferred on July 11, 2025, at approximately 09:33 — can be traced to **SUBJECT VIRTUAL CURRENCY ADDRESS 11**; and

e. 94,409 USDT can be traced to **SUBJECT VIRTUAL CURRENCY ADDRESS 12**.

**PM's funding of SUBJECT VIRTUAL CURRENCY ADDRESSES 7 and 9**

171. Separate funding for **SUBJECT VIRTUAL CURRENCY ADDRESS 7** shows that on June 5, 2025, at approximately 06:43, VCA **TUD2MZirKaHjBNwDJkVWHKTiNbiUGXZy1Z** ("**Zy1Z**") received one transfer from a VCA affiliated with PM at VCE Binance for 939,900 USDT, where it was commingled with additional

cryptocurrency from other sources. In addition, on June 5, 2025, at approximately 07:15, "**Zy1Z**" transferred 949,267 USDT to **SUBJECT VIRTUAL CURRENCY ADDRESS 7**.

172. On June 25, 2025, at approximately 08:22, **SUBJECT VIRTUAL CURRENCY ADDRESS 7** transferred 215,984 USDT to **SUBJECT VIRTUAL CURRENCY ADDRESS 9**.

173. The following chart, which is also attached to this declaration in larger format as **Graph Exhibit 9**, shows the transfer emanating from PM to **SUBJECT VIRTUAL CURRENCY ADDRESSES 7 and 9.**




<u>**PM's transfers into SUBJECT VIRTUAL CURRENCY ADDRESS 5 and tracing to ADDRESSES 13 and 6**</u>

174. As noted in paragraph 165, between February 16, 2025, and June 14, 2025, PM conducted 34 transfers from a wallet affiliated with VCE Binance into consolidation address **SUBJECT VIRTUAL CURRENCY ADDRESS 5**, totaling 22,973,995 USDT. Of these 34 transfers, I identified a single transfer that can be directly traced through **SUBJECT VIRTUAL CURRENCY ADDRESS 13** to **SUBJECT VIRTUAL CURRENCY ADDRESS 6**.

175. The funds moved as follows:

a. On May 14, 2025, at approximately 04:49, a transfer of 1,505,490 USDT was conducted from a wallet affiliated with PM at VCE Binance into consolidation address **SUBJECT VIRTUAL CURRENCY ADDRESS 5**.

b. On May 14, 2025, at approximately 04:59, 1,505,490 USDT was sent from **SUBJECT VIRTUAL CURRENCY ADDRESS 5** to **TE2SYhf3nDEKrEntvvrp9VneyBHMNkm7ko** ("**m7ko**").

c. On May 29, 2025, at approximately 07:36, 506,000 USDT was sent from "**m7ko**" to **TX41wriCD3s4r9J9oF8uCG9YjmZdYVLutS** ("**LutS**").

d. On May 29, 2025, at approximately 07:36, 500,000 USDT was sent from "**LutS**" to **TV2qn9mVTp7YAYXMKUL6yTMRYzyajr748z** ("**748z**").

e. On May 29, 2025, at approximately 09:57, 100,000 USDT was sent from "**748z**" to **TSySQRcjkbSyZiRRd8L2RyvYi6zzuLwkAy** ("**wkAy**"), where it was commingled with additional cryptocurrency from other sources.

f. On May 29, 2025, at approximately 10:03, 110,314 USDT was sent from "**wkAy**" to **TAKaZtkQMyzg2osiLoDbUu7MtTMJTUgZmy** ("**gZmy**"), otherwise known as **SUBJECT VIRTUAL CURRENCY ADDRESS 13**.

g. On May 29, 2025, at approximately 18:33, 104,166 USDT was sent from **SUBJECT VIRTUAL CURRENCY ADDRESS 13** to **TAo2aupo71ESWz9kNNJeSAtnfMcubU9MgR** ("**9MgR**"), where it was commingled with additional cryptocurrency from other sources.

h. On May 30, 2025, at approximately 09:35, 156,249 USDT was sent from "**9MgR**" to **TFPs8zTUhs8wp3yUyLhQPJZwuZMm1cR1mC** ("**R1mC**").

i. On May 30, 2025, at approximately 17:38, 83,547 USDT was sent from "**R1mC**" to **SUBJECT VIRTUAL CURRENCY ADDRESS 6**.

176. Of the 1,505,490 USDT that PM transferred into **SUBJECT VIRTUAL CURRENCY ADDRESS 5**, 100,000 USDT can be traced from **SUBJECT VIRTUAL CURRENCY ADDRESS 5** to **SUBJECT VIRTUAL CURRENCY ADDRESS 13**; and of the amount that passed through **SUBJECT VIRTUAL CURRENCY ADDRESS 13**, 83,547 USDT of the original 1,505,490 USDT can be traced to **SUBJECT VIRTUAL CURRENCY ADDRESS 6**.

177. The following chart, which is also attached to this declaration in larger format as **Graph Exhibit 10**, shows the transfer from wallets associated with PM at VCE Binance to **SUBJECT VIRTUAL CURRENCY ADDRESSES 13 and 6**.




**<u>SUBJECT VIRTUAL CURRENCY ADDRESS 10 as an intermediary pass-through</u>**

178. While the traced activity from PM and WJ through **SUBJECT VIRTUAL CURRENCY ADDRESS 10** was as an intermediary pass-through address, the pattern of activity outlined in this Declaration as to all **SUBJECT VIRTUAL CURRENCY ADDRESSES**, as well as within **Graph Exhibits 5-10**, shows that the group operating the investment fraud scheme utilizes **SUBJECT VIRTUAL CURRENCY ADDRESS 10** as an intermediate pass-through

wallet to obfuscate the source of the funds, believed to be associated with a cryptocurrency confidence fraud scheme.

179. As included in **Graph Exhibit 5**, **SUBJECT VIRTUAL CURRENCY ADDRESS 10** is also separately funded by over 2,000,000 USDT in transfers sourced to other unknown individuals believed to be within the same cryptocurrency confidence fraud scheme involving PM and WJ. This belief is based on the similar pattern of activity, large transfers minutes apart, and transfers following similar paths to the identified Thai nationals, with no known legitimate reason to move the funds in a way that needlessly drives up the cost of moving them, just like the rest of the **SUBJECT VIRTUAL CURRENCY ADDRESSES**.

180. I back-traced the 2,000,000 USDT in transfers separately funding **SUBJECT VIRTUAL CURRENCY ADDRESS 10** to VCE Binance; however, Binance was unable to provide KYC data for the individuals conducting the transactions. This is because, although the transactions appear to be from Binance, they are from entities utilizing Binance's infrastructure, and Binance therefore has no access to the customer KYC information. Since the beginning of this investigation, I have experienced a notable increase in responses of this kind, where no KYC information can be provided when attempting to identify the originators of transactions believed to be associated with a cryptocurrency confidence fraud scheme.

181. The following chart, which is also attached to this declaration in larger format as **Graph Exhibit 11**, shows the relationship between **SUBJECT VIRTUAL CURRENCY ADDRESSES 5, 6, 7, 8, 9, 10, 11, and 13** in their entirety. The **SUBJECT VIRTUAL CURRENCY ADDRESSES** are color coded: Red is 5, aqua is 6, orange is 7, green is 8, purple is 9, pink is 10, black is 11, and yellow is 13.



**Corroboration from HSI Bangkok TCIU**

182. In August 2025, HSI Bangkok's Transnational Criminal Investigative Unit (TCIU), a vetted unit comprised of Royal Thai Police investigators, provided information that the Thai national identified as PM is currently under investigation by Thai authorities. That investigation concerns multiple criminal complaints from Thai victims alleging that PM and her son, SM, among others, were perpetrating an investment fraud scheme. Given PM's and WJ's intertwined cryptocurrency transfers, this information further corroborates that all funds emanating from WJ are likely sourced to the cryptocurrency confidence fraud scheme. Additional information provided by the TCIU shows that WJ's residential address returned to an individual named NL; based on the TCIU's review of financial and travel records, it is believed that NL is the user of the WJ accounts.

183. In or about April 2026, the Royal Thai Police Cyber Crime Investigation Bureau (CCIB) arrested PM and PM's son, SM for fraud related charges. In an interview by CCIB with

SM, he described that he operated an unlicensed money services business where he was buying USDT peer to peer and trading it on the Binance platform.

184. SM utilized an associate known as "Phong" as the go between to find clients. SM stated that Phong sends bank account numbers and wallet addresses for incoming deals. SM maintained that he had multiple clients, but that Phong is the lone conduit for locating and contacting their clients.

185. SM utilized his mother, PM, as a co-director for their company in Thailand because the company required two directors. SM claimed that his mother was not actually involved in the operation of the company or this activity.

186. SM stated he does not collect Know Your Customer information for clients but noted that his primary customer was a Chinese national called "Zhang", who requested SM's cross-network (blockchain network) conversion services for USDT. SM would receive USDT on the BSC network via Binance, then transfer it to the client's wallet on their requested network. This is a direct explanation for the activity described between PM and WJ in paragraph 127.

187. SM claimed that his business was defrauded by Zhang, who allegedly stole 4,000,000 USDT. There is no information suggesting that SM reported this crime to police, but SM claimed that his associate Phong hired a private investigator to locate Zhang.

**<u>Tracing from WJ to SUBJECT VIRTUAL CURRENCY ADDRESSES 14 and 15</u>**

188. On August 6, 2025, WJ completed 12 transfers totaling 6,499,972.4 USDT into **SUBJECT VIRTUAL CURRENCY ADDRESS 5**; 11 transfers were in the amount of 499,997.7 USDT and the twelfth was in the amount of 999,997.7 USDT. This activity mirrors WJ's prior transfers into **SUBJECT VIRTUAL CURRENCY ADDRESS 5** on June 18, 2025 (see paragraph 166), which have already been targeted and seized by me as proceeds of a cryptocurrency

confidence fraud scheme. In total, from June 18, 2025, to August 6, 2025, WJ transferred approximately 12.5 million USDT to **SUBJECT VIRTUAL CURRENCY ADDRESS 5**. The movement of near-identical amounts in multiple transfers over a short period is consistent with the movement seen previously involving this same Thai investment fraud scheme.

189. Also on August 6, 2025, WJ completed 3 transfers totaling 1,499,898.46 USDT into **SUBJECT VIRTUAL CURRENCY ADDRESS 14**, in the amounts of 499,999.52 USDT, 499,999.52 USDT, and 499,999.51 USDT. These transfers were funded by 18 different deposits on August 6, 2025, into WJ's OKX-hosted wallet, totaling 7,999,962 USDT. This movement is likewise consistent with the same Thai investment fraud scheme, as described in other parts of this declaration.

190. On August 14, 2025, at 11:16:11 AM, 1,165,120.49 USDT was transferred from **SUBJECT VIRTUAL CURRENCY ADDRESS 14** to **SUBJECT VIRTUAL CURRENCY ADDRESS 15**. Based on information received from VCE OKX, all of the OKX withdrawals depicted below are from a hosted wallet with OKX that is controlled, owned, and operated by WJ.

191. The following chart, which is also attached to this declaration in larger format as **Graph Exhibit 12**, shows the movement of transfers emanating from WJ's OKX wallets to SVCAs 5, 14, and 15.




192. All of the transfers described in Paragraphs 188-190 were funded by deposits from Binance hosted wallets in the name of WJ. No legitimate business purpose can be ascertained for the division of the funds into a total of fifteen transfers between two VCAs. That these fifteen transfers of nearly identical amounts are originating from the same individual at OKX, funded by the same person at another exchange and owned by an individual with known fraudster affiliations, further establishes probable cause that all of these movements are an effort to obfuscate the source as proceeds from a cryptocurrency confidence fraud scheme.

**<u>First source of funding for SUBJECT VIRTUAL CURRENCY ADDRESS 16 – WJ and VCA "33e0"</u>**

193. WJ's OKX account was created in September 2024. Starting in mid-October 2024, WJ began sending large transactions approximating 140,000 USDT each in rapid succession, a

method similar to a funnel account at brick-and-mortar financial institutions across the southwest border of the U.S. These transfers were sourced from WJ's hosted wallet at Binance and were rapidly withdrawn in similar amounts, aggregating in VCA **0x23f307dd3fc2000850c8e7fddce948da3e6d33e0** ("**33e0**").

194. From October 12, 2024, to January 1, 2025, WJ conducted 51 transfers from her OKX-hosted wallet to "**33e0**". The amounts ranged in value from 115,605 USDT to 146,196 USDT, averaging 142,605 USDT and totaling approximately 7,258,313.47 USDT. These transfers have been aggregated, below, based on month; and at the beginning of the following month, one large transfer was routinely completed from "**33e0**" to VCA **0xc729cfdeaf5e3be850c4adf057c05193158507d0** ("**07d0**") as follows:

a. From October 12, 2024, to October 29, 2024, 14 transfers from WJ were completed totaling 2,000,580 USDT to "**33e0**". On November 1, 2024, these transfers were commingled with other funds in a transfer to "**07d0**" totaling 6,315,516.87 USDT. These "other funds" are sourced to other actors believed to be involved in the investment scam.

b. From November 1, 2024, to November 30, 2024, 20 transfers from WJ were completed totaling 2,831,217.36 USDT to **"33e0"**. On December 1, 2024, these transfers were commingled with other funds in a transfer to **"07d0"** totaling 6,674,322.79 USDT. These "other funds" are sourced to other actors believed to be involved in the investment scam.

c. From December 1, 2024, to January 1, 2025, 17 transfers from WJ were completed totaling 2,426,515.91 USDT to **"33e0".** On January 1, 2025, these transfers were commingled with other funds in a transfer to **"07d0"** totaling

4,923,728.74 USDT. These "other funds" are sourced to other actors believed to be involved in the investment scam.

195. On January 1, 2025, VCA **"07d0"** transferred 25,175,985.500006 USDT to **SUBJECT VIRTUAL CURRENCY ADDRESS 16.**

196. The following chart, which is also attached to this declaration in larger format as **Graph Exhibit 13**, depicts the 51 transfers from WJ that route to SVCA 16.




## <u>Second Source of Funding for SUBJECT VIRTUAL CURRENCY ADDRESS 16 – Three Thai Nationals and Four Citizens of Hong Kong, All with Ties to VCA "33e0"</u>

197. Between June 2024 and October 2024 **SUBJECT VIRTUAL CURRENCY ADDRESS 16** was also funded by over 160 transfers from three additional Thai nationals and four citizens of Hong Kong, identified after back-tracing the incoming transfers into **SUBJECT VIRTUAL CURRENCY ADDRESS 16** to VCE Binance.

198. According to VCE Binance, the three additional Thai nationals were identified as Phuthasilp PHONLABUT (PP), Jurairat CHAIKAEW (JC), and Siriyako KHAMSRI (SK). These individuals appear to operate out of the same location; likely a scam center located on the border between Thailand and Myanmar, for the reasons stated below.

a. Analysis of their access logs into Binance shows that all three frequently access Binance from the same IP addresses dating back to September 2024.

b. Additionally, PP and SK use the same general naming convention for their email addresses: mobile1031@outlook.com and mobile931971@outlook.com. JC's email address, jay.tradingoffice@gmail.com, matches the naming conventions noted by Thai authorities for the units contained within the scam centers themselves, which were separated by task and language.

199. According to VCE Binance, the four citizens of Hong Kong were identified as Wai Shan Jaymi SIN (WS), Wing Yue NG (WN), Chu Mui NG (CN), and Wai Yuk CHONG (WC). These four individuals also appear to operate out of the same location; likely a scam center-affiliated location in Hong Kong, for the reasons stated below.

a. Analysis of their Binance access logs shows they frequently access Binance from IP addresses using the same network and are geolocated to the same approximate area in Hong Kong.

b. WS, WN, CN, and WC all use the same naming convention for their email addresses; mui96t@yahoo.com, pig96t@yahoo.com, bonnie9696t@yahoo.com, and yuk96t@yahoo.com.

200. Based on my knowledge of scam centers and the associated personnel, the perceived coordinated transfers among the individuals, similar email naming conventions, and IP address log information, I reasonably believe that PP, JC, SK, WS, WN, CN, and WC all operate for the same scam organization, but likely in different departments or sections.

201. Specifically, on April 4, 2024, wallets controlled by Hong Kong citizens WS, WN, CN, and WC conducted four transfers totaling 299,972 USDT into **0xb51c8d37a9be3046361bc1ca5079858d1edab004** ("**b004**") and four transfers totaling 299,928

USDT into **0x691e2a2f34c5f737899848e45e352909ff328e11** ("**8e11**"). Note these aggregate amounts are nearly identical.

202. On April 17, 2024, 285,653 USDT is transferred from "**8e11**" to VCA **0xaC22C8B85CD4AB660A43318eCB3D0DeB10386057** ("**6057**") and 285,585 USDT is transferred from "**b004**" to VCA **0x55742e2D594d11FFcC6B637c648d44F9B61847f9** ("**47f9**"), where it is commingled with other funds. Again, note these amounts are nearly identical. These funds are consolidated into **0xef0c4b07bf640e5b43ef4a41e1b04740e13982dd** ("**82dd**"):

a. On April 17, 2024, 300,000 USDT transferred from "**47f9**" into "**82dd**".

b. On September 10, 2024, 200,000 USDT is transferred from "**6057**" into "**82dd**".

203. On September 11, 2024, 329,000 USDT transferred from "**82dd**" to **0xc86CF9C8403AB63AD1e30fc9f3a0c4Ec750e655A** ("**655a**"). These funds eventually connect with the below transfers from PP, JC, and SK after consolidation at "**655a**".

204. From June 2024 to October 2024, Thai nationals PP, JC, and SK, conducted a total of 161 transfers ranging in amounts from 5,605 USDT to 305,933 USDT, totaling 15,055,973.01 USDT into consolidation wallet **0x742e5e2e0c305d5d5ef7d28fc4a26b499e596a6e** ("**6a6e**").

205. From "**6a6e**", the funds split:

a. Nine (9) transfers totaling 1,018,339.44 USDT from "**6a6e**" are sent to **0xde394383316971883f16045264b4ca0c78979848** ("**9848**") between August 30, 2024, to September 8, 2024.

i. These nine transfers fund nine transfers to "**0397**" from August 30, 2024, to September 8, 2024, totaling 1,014,917.72 USDT and a single transfer to "**655a**" on September 12, 2024, for 146,972.37 USDT.

b. Twenty-four (24) transfers totaling 6,253,964.84 USDT from "**6a6e**" are sent to **"655a"** between September 2, 2024, to October 18, 2024.

206. At "**655a**", the transfers from Hong Kong citizens WS, WN, CN, and WC mix with the funds from Thai nationals PP, JC, and SK. These deposits funded 27 transfers totaling 7,821,009.19 between September 2, 2024, and October 18, 2024, to VCA **0x68534cc6D3eCba639Ab27e20B7e5d10EC9be0397** ("**0397**"). The transfers from "**655a"** are commingled with other funds in **"0397".**

207. The transfers to "**0397**" split and funded 27 transfers to 0x23f307dd3fc2000850c8e7fddce948da3e6d33e0 ("**33e0**") totaling 7,350,819.18 USDT, five transfers to 0xc729cfdeaf5e3be850c4adf057c05193158507d0 (**"07d0"**) totaling 569,803 USDT, and three transfers to 0xd2eafdc76e47a7e34624ff4415d28d4a7eca840b (**"840b"**) totaling 735,294 USDT between August 30, 2024, and October 18, 2024.

a. At **"840b"** the funds commingle with 127,534.5 USDT from WJ and partially fund five transfers to "**33e0**" between September 25, 2024, to October 10, 2024, totaling 938,357.08 USDT.

b. At "**33e0**", the funds from WJ, WS, WN, CN, WC, PP, JC, and SK, funded four transfers to **"07d0"** totaling 25,304,476.396786 USDT between October 7, 2024, and January 1, 2025.

c. At **"07d0"**, the commingled deposits funded a single transfer of 25,175,985.500006 USDT on January 1, 2025, to **SUBJECT VIRTUAL CURRENCY ADDRESS 16**, just 8 minutes after **"07d0"** received its last transfer from "**33e0**".

208. In totality, between April 4, 2024, to January 1, 2025, WJ, WS, WN, CN, WC, PP, JC, and SK sent over 240 transfers totaling 23,024,594.7 USDT believed to be sourced to the cryptocurrency confidence fraud scheme that eventually commingled with other funds. Approximately 15,166,381.27 of the 23,024,594.7 USDT was sent between June 2024 and October 2024. Of the total 23,024,594.7 USDT, I traced approximately 15,426,310.19 USDT from WJ, WS, WN, CN, WC, PP, JC, and SK to **SUBJECT VIRTUAL CURRENCY ADDRESS 16.**

209. The following chart, which is also attached to this declaration in larger format as **Graph Exhibit 14**, shows the movement of funds for all the transfers from WJ, WS, WN, CN, WC, PP, JC, and SK from April 4, 2024, to January 1, 2025.



__Identification of Additional Thai Nationals Linked to PM__

210. The following paragraphs show that **SUBJECT VIRTUAL CURRENCY ADDRESSES 17-31** are linked to the same group utilizing **SUBJECT VIRTUAL CURRENCY ADDRESSES 1-16** to launder the proceeds of the cryptocurrency confidence fraud scheme

perpetrated against GM, DR, DC, IC, EM, and countless other potential victims. The common control of **SUBJECT VIRTUAL CURRENCY ADDRESSES 17-31** is shown principally by the movement of funds: each of **SUBJECT VIRTUAL CURRENCY ADDRESSES 18-31** received USDT traced from **SUBJECT VIRTUAL CURRENCY ADDRESS 17**, directly or through intermediate addresses, and the gas fee and opening deposit patterns described below corroborate that conclusion. The connection between that group and the fraud against the identified victims is shown by the participation of PM, who is common to both; by the participation of Worapat MONTHANOM, who appears both in the creation and subsequent funding of **SUBJECT VIRTUAL CURRENCY ADDRESS 17**; and by the similarities between the two sets of SVCAs regarding the flow of funds with no discernable business purpose other than to obscure the origin of the funds. These similarities include large sums of cryptocurrency being divided among multiple VCAs and transmitted in near-identical increments, frequently set just below a round number; the prompt re-consolidation of those increments into a single address; onward movement through chains of intermediary wallets that were newly created, held the funds only briefly, and retained none of them; routing that sometimes returns funds to the same exchange or consolidation address from which they came; and, throughout this process, the incurring of a separate transaction fee at every hop without any corresponding commercial benefit.

211. Given PM's known connections to investment fraud schemes, I further reviewed PM's transaction histories to identify similar activity to what was seen with PM's use of earlier scam-consolidation wallets. A review of PM's transactions emanating from VCE Binance identified two (2) transactions on July 2, 2025, for 999,900 USDT and 550,000 USDT that routed into VCA **0x61ae87da420db0b8b56244b9a47e73fc9eb0ab40** ("**ab40**"). These two transfers

combine into one outgoing transfer of 1,587,202 USDT from "**ab40**", also on July 2, 2025, to VCA **0x2637c4bfdbfd3955fc2fa2793f88b735259bbeab** ("**beab**").

212. On July 2, 2025, PM transferred 1,540,833 USDT from "**beab**" into **SUBJECT VIRTUAL CURRENCY ADDRESS 17** via two transactions of 833 USDT at 08:07 and 1,540,000 USDT at 08:27. Based on my training and experience, it is likely that the 833 USDT was a test transaction before sending the larger amount. After routing into **SUBJECT VIRTUAL CURRENCY ADDRESS 17**, these transfers eventually funded withdrawals at VCE Wintermute. While these transactions did not stay in any of the **SUBJECT VIRTUAL CURRENCY ADDRESSES,** they established the usage of additional consolidation addresses utilized by known fraudster PM in the money laundering operation for the cryptocurrency investment fraud scheme I investigated.

213. Additional review of **SUBJECT VIRTUAL CURRENCY ADDRESS 17** identified multiple large incoming transfers from VCEs Binance, Bybit, and OKX between September 7, 2025, and October 25, 2025. These deposits were followed by rapid withdrawals in a similar method to that used by PM. Additionally, the majority of the withdrawals flowed through multiple pass-through wallets, some of which conducted in a circular manner, only to be reconsolidated and ultimately parked upwards of five hops from when they were withdrawn from **SUBJECT VIRTUAL CURRENCY ADDRESS 17.**

214. A review of the initial gas fees for **SUBJECT VIRTUAL CURRENCY ADDRESS 17** shows that they were paid by VCA 0**xc79899f171af14a24d18bade3d0e6205cfdd54b2 ("54b2")** on July 2, 2025, at 03:40, less than five hours before the deposits funded by PM were completed. The deposits funded by PM (totaling 1,540,833 USDT) into **SUBJECT VIRTUAL CURRENCY ADDRESS 17** were the first

transfers into **SUBJECT VIRTUAL CURRENCY ADDRESS 17** after the gas fees were paid. The timing of this activity suggests that the owner of **SUBJECT VIRTUAL CURRENCY ADDRESS 17** and PM were in close communication to coordinate the gas fee payments and transfers.

215. According to information received from VCE Binance, in addition to PM, five Thai nationals conducted twenty-one (21) deposits into **SUBJECT VIRTUAL CURRENCY ADDRESS 17** from Binance-hosted wallets between September 7, 2025, and October 25, 2025. The subjects conducting the transactions were Mr. Praphatphong MAYURET, Mr. Tiptong MUKMONTREE, Mr. Wasin HOMSA ARD, Mr. Namkul VERAWAT, and Mr. Warut AMORNCHAILERDPATCNA.

216. According to information from VCE OKX, these same five Thai nationals conducted eighteen (18) deposits into **SUBJECT VIRTUAL CURRENCY ADDRESS 17** from OKX-hosted wallets between September 8, 2025, and October 25, 2025.

217. According to information received from VCE Bybit, four of these five Thai nationals conducted sixteen (16) deposits into **SUBJECT VIRTUAL CURRENCY ADDRESS 17** from Bybit-hosted wallets between September 8, 2025, and October 25, 2025. The subjects conducting the transactions were Mr. Praphatphong MAYURET, Mr. Tiptong MUKMONTREE, Mr. Wasin HOMSA ARD, and Mr. Warut AMORNCHAILERDPATCNA.

218. There were a total of 54 deposits conducted between September 7, 2025, and October 25, 2025, from OKX, Bybit, and Binance into **SUBJECT VIRTUAL CURRENCY ADDRESS 17.** Those 54 deposits were conducted by a mix of the same five Thai nationals. These Thai nationals first transferred what is believed to be illicit funds into three separate VCEs, only

to then deposit those illicit funds into a single consolidation address, **SUBJECT VIRTUAL CURRENCY ADDRESS 17.**

219. The five Thai nationals responsible for the deposits described in the preceding paragraphs are believed to be linked to PM and the cryptocurrency confidence fraud scheme described throughout this Declaration. This conclusion derives from the sourcing of the transfers from VCEs Bybit, Binance, and OKX, the rapid movement of USDT to and from **SUBJECT VIRTUAL CURRENCY ADDRESS 17** by these same five (5) individuals in patterns consistent with activity conducted by PM (all of which is inconsistent with legitimate business activity). These connections are in addition to Thai national Worapat Monthanom, identified alongside the group of five Thai nationals mentioned throughout this declaration, as an individual involved with and receiving withdrawals from the referenced BTC peel chain operated with the five Thai nationals that funded a significant portion of the transfers into the **SUBJECT VIRTUAL CURRENCY ADDRESSES 17** to **31** (for more information on the peel chain, see paragraph 225). Also, as referenced in paragraph 220, Worapat MONTHANOM conducted the initial deposit into the virtual currency address chain that paid the initial gas fees for **SUBJECT VIRTUAL CURRENCY ADDRESS 17.**

220. Specifically, MONTHANOM conducted the first deposit into VCA **0x2db81f845fcaa28a04ebe1922451c13bb1ebc6f8** ("**c6f8**") on October 7, 2022, and another Thai national named Sriwiwat YINGCHAROENTHANA, who is affiliated with the same peel chain subjects, started the ETH gas payment from Binance on October 14, 2022, into **0xc96d7fe84d0ec5e8a56e048fbb30788ba6671ca8**, which then paid the gas fees for "**c6f8**" on October 20, 2022.

221. On August 6, 2024, **"c6f8"** transferred .007 ETH to VCA **0xb470091dc1cf11c5e68ebe8356a268f5297a5afd** (**"5afd"**) and on June 16, 2025, **"5afd"** transferred the initial gas payment of .06 ETH to **"54b2"**.

222. On July 2, 2025, **"54b2"** transferred the .2 ETH gas payment to **SUBJECT VIRTUAL CURRENCY ADDRESS 17,** which was just 5 hours prior to the receipt of the 1,540,000 USDT sent by PM.

223. Based on PM's opening of **SUBJECT VIRTUAL CURRENCY ADDRESS 17** within hours of its initial gas funding, MONTHANOM's appearance both among the recipients of the bitcoin that funded the deposits into that address and at the head of the chain that gas-funded it, and the correspondence in method between these transfers and those described earlier in this declaration, there is reason to believe that Worapat MONTHANOM, Sriwiwat YINGCHAROENTHANA, PM, and the five Thai nationals identified above are operating for or within the same cryptocurrency confidence fraud scheme that includes WJ and that ultimately defrauded victims DR, DC, IC, EM, and GM.

224. A transactional review of **SUBJECT VIRTUAL CURRENCY ADDRESS 17** showed the incoming deposits described starting in paragraph 215 from Mr. Praphatphong MAYURET, Mr. Tiptong MUKMONTREE, Mr. Wasin HOMSA ARD, Mr. Namkul VERAWAT, and Mr. Warut AMORNCHAILERDPATCNA totaled over 50 million in USDT transfers over a roughly six-week period. Forty-one (41) of the fifty-four (54) transfers were for amounts between 980,000 and 990,000 USDT. The transfers from these subjects were primarily grouped on September 8, 2025, October 1, 2025, October 13, 2025, October 14, 2025, October 15, 2025, and October 25, 2025.

**Sourcing to BTC "Peel Chain" Involving the Same 5 Thai Nationals**

225. I conducted back-tracing of the deposits into VCEs OKX, Bybit, and Binance to determine the source of the deposits into the VCEs that consolidated into **SUBJECT VIRTUAL CURRENCY ADDRESS 17** from Mr. Praphatphong MAYURET, Mr. Tiptong MUKMONTREE, Mr. Wasin HOMSA ARD, Mr. Namkul VERAWAT, and Mr. Warut AMORNCHAILERDPATCNA. The review identified a massive Bitcoin (BTC) peel chain where wallets, some of which contained hundreds of BTC, "peel" off withdrawals or split them from the larger amount in sequential transactions. In this case, each "peel" is usually between 8.5 to 8.9 BTC that are sent into the hosted wallets for these five Thai nationals at VCEs OKX, Binance, and Bybit. These "peels" are what funded the referenced 54 transfers into **SUBJECT VIRTUAL CURRENCY ADDRESS 17** noted starting at paragraph 218. *See* **Graph Exhibit 15** to see some of the "peel chain" transactions.

226. A "peel chain" is possible because of the way the Bitcoin protocol handles value. Bitcoin does not maintain account balances; it records discrete units of value, and a sender must consume an entire unit in each transaction. A person holding a single large amount of Bitcoin who wishes to send a smaller amount must therefore create two outputs: one to the intended recipient, and one returning the remaining balance to an address the sender controls, referred to as a "change" address. In a peel chain, the sender repeats that process, "peeling" a comparatively small payment to a destination at each step while directing the large remainder to a newly created change address, which then becomes the source of the next transaction. The result is a single large balance that migrates across a long series of addresses, shedding similarly sized payments along the way.

227. Each step in the peel chain sequence can be executed only by a person in possession of the private key associated with the preceding address. The Bitcoin held in a peel chain cannot

be moved by anyone else. The existence of a single continuous peel chain therefore establishes that one person, or a group of people acting in concert and sharing control of the same keys, controlled the entire balance throughout the chain's operation. In peel chain analysis, the identification of the change address and spend address are the main factor for establishing the single user or group acting in concert. In this circumstance, because the peel chain off ramps to an exchange, it is definite that the spend address is the transaction going to the exchange. Therefore, based on my training and experience, the peel chain identified in this case is likely used by the same individual or group acting in concert with one another.

228. Based on my training and experience, a peel chain serves several money laundering purposes. Principally, a peel chain converts one large and conspicuous sum into a series of individually unremarkable payments, none of which would attract attention on its own. It also places a large number of intervening transactions between the origin of the funds and each payment made from them, so that identifying the source of any single payment requires following the chain backward through every preceding transaction. Finally, because each payment goes to a different destination and those destinations may not transact with one another, the payments appear unrelated unless the chain connecting them is identified. Criminal organizations can therefore utilize this method to distribute criminal proceeds across multiple accounts and multiple VCEs while concealing the nature, source, ownership, and control of the funds, and reducing the likelihood that any single deposit is identified as suspicious by the receiving institution.

229. The "peel chain" consists of potentially hundreds, if not thousands, of transactions. I therefore examined a sample of "peeled" transactions along the chain that preceded the deposits into **SUBJECT VIRTUAL CURRENCY ADDRESS 17**. The "peeled" transactions that I examined were all deposited into accounts at VCE Binance, OKX, and Bybit attributable, through

Know Your Customer records, to Mr. Praphatphong MAYURET, Mr. Tiptong MUKMONTREE, Mr. Wasin HOMSA ARD, Mr. Namkul VERAWAT, Mr. Worapat Monthanom, and Mr. Warut AMORNCHAILERDPATCNA. The sampled "peels" occurred on October 14 and October 15, 2025, dates falling within the period of the deposits into SUBJECT VIRTUAL CURRENCY ADDRESS 17 described above and in **Graph Exhibit 15**.

230. Based on my review, and the information included in paragraphs 225-229 noting that the existence of a single continuous peel chain establishes that one person, or a group of people acting in concert and sharing control of the same keys, and therefore controlled the entire balance throughout the peel chain's operation, there is a reasonable basis to conclude that a single coordinated group of Thai nationals is moving the funds believed to be sourced to a cryptocurrency confidence fraud scheme through multiple VCAs and VCEs in a way to obfuscate the original source of the funds. This conclusion is supported by the fact that Worapat MONTHANOM appears at two separate and otherwise unrelated points in this activity. First, he is among the individuals to whose VCE accounts the sampled peels were deposited, as described above. Second, as set out in paragraph 225, he made the first deposit into VCA **"c6f8"**, the wallet at the head of the chain of Ethereum transfers that funded the initial gas fees for **SUBJECT VIRTUAL CURRENCY ADDRESS 17**. Those two roles are distinct: the first concerns the Bitcoin that funded the deposits into **SUBJECT VIRTUAL CURRENCY ADDRESS 17**, and the second concerns the Ether required to create and operate that address in the first place. Based on my training and experience, a single individual appearing in both roles is not consistent with an arm's-length relationship between the source of the funds and the operator of the receiving address but rather indicates that the funding of **SUBJECT VIRTUAL CURRENCY ADDRESS 17** and the creation of that address were undertaken by the same group.

231. The following chart, which is also attached to this declaration in larger format as **Graph Exhibit 15**, shows a snapshot of the "peel chain" transactions from Mr. Praphatphong MAYURET, Mr. Tiptong MUKMONTREE, Mr. Wasin HOMSA ARD, Mr. Namkul VERAWAT, Mr. Worapat Monthanom, and Mr. Warut AMORNCHAILERDPATCNA to VCEs Bybit, Binance, and OKX.




232. Once the funds were deposited and aggregated into **SUBJECT VIRTUAL CURRENCY ADDRESS 17,** the scam group withdrew the funds across multiple wallets. The below tracing is sourced directly to deposits incoming from the five (5) Thai nationals believed to be operating in the same scam group as PM -- Mr. Praphatphong MAYURET, Mr. Tiptong MUKMONTREE, Mr. Wasin HOMSA ARD, Mr. Namkul VERAWAT, and Mr. Warut AMORNCHAILERDPATCNA.

233. Based on the complexity, size, and movements through multiple persons' unhosted wallets and exchanges, the "peel chain" is likely another layer in the scam group's money laundering operation in an effort to distance the illicit proceeds further and further from their original source.

234. As noted starting at paragraph 224, a transactional review of **SUBJECT VIRTUAL CURRENCY ADDRESS 17** showed 54 deposits from Mr. Praphatphong MAYURET, Mr. Tiptong MUKMONTREE, Mr. Wasin HOMSA ARD, Mr. Namkul VERAWAT, and Mr. Warut

AMORNCHAILERDPATCNA from hosted wallets under their control at VCEs Binance, Bybit, and OKX totaling over 50 million in USDT. These incoming deposits funded outgoing transfers to **SUBJECT VIRTUAL CURRENCY ADDRESSES 18 – 31**, totaling over 42 million USDT between September 7, 2025, and October 25, 2025.

235. The following chart, which is also attached to this declaration in larger format as **Graph Exhibit 16**, shows the movement from the VCEs into **SUBJECT VIRTUAL CURRENCY ADDRESS 17** and onward to **SUBJECT VIRTUAL CURRENCY ADDRESSES 18 – 31.**



**<u>TRACING TO SUBJECT VIRTUAL CURRENCY ADDRESSES 18 - 31</u>**

236. Starting on September 9, 2025, two transfers were conducted from **SUBJECT VIRTUAL CURRENCY ADDRESS 17** to VCA **0x64da5f72f743e5b9893baf8408893f2b00914efc** (“**4efc**”) in amounts of 5,974,300 and 4,000,000 USDT. These transfers are included in **Graph Exhibit 16**, colored in red.

237. From “**4efc**”, the transfers split, funding a transfer on September 11, 2025, of 5,999,900 USDT to VCA **0xdbd718d79a6441a32af7d54ad67308a99c98e78e** (“**e78e**”) and a

transfer of 1,276,975 USDT on October 4, 2025, to VCA **0xdace0a0036df3d3a5db283b4d076ec23d3371366** ("**1366**"), where the funds were commingled with additional USDT.

a. At **"e78e",** the transfers split again, funding a transfer of 4,687,000 USDT to VCA **0x9ca0088ab7fb932d3466f7850e070be4a18dfb3d** ("**fb3d**") on September 29, 2025, and a transfer 1,002,937.012305 USDT to consolidation address "**29d3**" on October 24, 2025. The flow to consolidation address "**29d3**" is a continual pattern throughout the tracing laid out below. The flows into "**29d3**" were consolidated, held, and ultimately facilitated two final withdrawals to **SUBJECT VIRTUAL CURRENCY ADDRESS 23** that are explained starting in paragraph 249.

i. The transfer to **"fb3d"** of 4,687,000 USDT funded a transfer of 4,687,400 USDT from **"fb3d"** to consolidation address **SUBJECT VIRTUAL CURRENCY ADDRESS 28** on September 29, 2025.

ii. This transfer into consolidation address **SUBJECT VIRTUAL CURRENCY ADDRESS 28** funded four (4) outgoing transfers totaling 2,096,700 USDT on October 4, 2025, into **SUBJECT VIRTUAL CURRENCY ADDRESSES 24, 25, 26, and 27.**

1. **SUBJECT VIRTUAL CURRENCY ADDRESS 24** received 597,000 USDT;

2. **SUBJECT VIRTUAL CURRENCY ADDRESS 25** received 499,900 USDT;

3. **SUBJECT VIRTUAL CURRENCY ADDRESS 26** received 499,900 USDT; and

4. **SUBJECT VIRTUAL CURRENCY ADDRESS 27** received 499,900 USDT.

iii. These transfers were conducted less than three (3) hours after the initial gas fees were paid into **SUBJECT VIRTUAL CURRENCY ADDRESS 28** and just 6 days after **SUBJECT VIRTUAL CURRENCY ADDRESS 28** received its opening deposit on September 29, 2025.

iv. **SUBJECT VIRTUAL CURRENCY ADDRESSES 24, 25, 26, and 27** all received approximately 100 USDT opening deposits from **SUBJECT VIRTUAL CURRENCY ADDRESS 28** minutes prior to receiving the large transfers totaling 2,096,700 USDT.

v. The split of the transfers into **SUBJECT VIRTUAL CURRENCY ADDRESSES 24, 25, 26, and 27** along with the timing of the opening deposits from the same address suggests that the owner(s) of **SUBJECT VIRTUAL CURRENCY ADDRESSES 24, 25, 26, and 27** and **SUBJECT VIRTUAL CURRENCY ADDRESS 28** are working together or are potentially the same individual or group.

b. From "**1366**", 1,500,554.060111 USDT was transferred to consolidation address, **SUBJECT VIRTUAL CURRENCY ADDRESS 28**, on October 12, 2025.

i. On October 24, 2025, 509,706 USDT transferred from **SUBJECT VIRTUAL CURRENCY ADDRESS 28** to consolidation address **0x86cf2a03a83f02be4834866e42a3931de5ea29d3** ("**29d3**").

238. On October 1, 2025, 6,344,500 USDT transferred from **SUBJECT VIRTUAL CURRENCY ADDRESS 17** to VCA **0xda11556c37bbbefa5d46fb6646063d6fd09be267** ("**e267**"). These transfers are included in **Graph Exhibit 16**, colored in blue.

239. On October 12, 2025, 976,581.422941 USDT transferred from "**e267**" to consolidation address **SUBJECT VIRTUAL CURRENCY ADDRESS 28.**

240. As noted above, the red (paragraph 236) and blue tracks (paragraph 238) on **Graph Exhibit 16** from October 12, 2025, consolidate into **SUBJECT VIRTUAL CURRENCY ADDRESS 28.** These two tracks fund an outgoing transfer of 4,545,000 USDT into VCA **0xef8dcd01194bd66a3359ea5f866af0ec7640f6e7** ("**f6e7**") on October 12, 2025. This transfer was then split into two outgoing transfers from **"f6e7"** of 788,200 USDT to VCA **0xc6191bdc160a36db39e6faf7f874e1da0b93ce37** ("**ce37**") and 999,900 USDT to VCA **0x0a33e604b2e231253621772566e47c7049122f2c** ("**2f2c**") on October 21, 2025. These transfers are included in **Graph Exhibit 16** as the purple track. At each destination, the transferred funds were commingled with additional USDT.

a. From "**ce37**", 1,000,000 USDT was transferred to consolidation address "**29d3**" on October 24, 2025.

b. From **"2f2c"**, 1,000,000 USDT was transferred to consolidation address "**29d3**" on October 24, 2025.

241. On October 15, 2025, 4,999,900 USDT transferred from **SUBJECT VIRTUAL CURRENCY ADDRESS 17** to VCA **0x314ff5264f885a6c7dedbef6ba5f8a7c96ec9327** ("**9327**"). These transfers are included in **Graph Exhibit 16** as the orange track.

a. From "**9327**", 4,000,000 USDT transferred to consolidation address "**29d3**" on October 24, 2025.

b. From "**9327**", 999,900 USDT transferred to **SUBJECT VIRTUAL CURRENCY ADDRESS 30** on October 21, 2025**.**

i. From **SUBJECT VIRTUAL CURRENCY ADDRESS 30**, 709,965 USDT transferred to consolidation address "**29d3**" on October 24, 2025.

242. On October 15, 2025, 4,999,900 USDT transferred from **SUBJECT VIRTUAL CURRENCY ADDRESS 17** to consolidation address "**29d3**". This transfer is included in **Graph Exhibit 16** as the yellow track.

243. On October 25, 6,226,600 USDT transferred from **SUBJECT VIRTUAL CURRENCY ADDRESS 17** to **SUBJECT VIRTUAL CURRENCY ADDRESS 18.** This transfer funded 4 outgoing transfers of 1,999,900; 999,900; 1,000,000; and 1,999,900 USDT to **SUBJECT VIRTUAL CURRENCY ADDRESSES 20, 21, and 22.** Specifically, **SUBJECT VIRTUAL CURRENCY ADDRESS 20** received one transfer for 1,999,900**; SUBJECT VIRTUAL CURRENCY ADDRESS 21** received a transfer of 999,900 USDT and another for 1,000,000 USDT; and **SUBJECT VIRTUAL CURRENCY ADDRESS 22** received a transfer of 1,999,900 USDT. These transfers are included in **Graph Exhibit 16** as the pink track.

244. On October 25, 2025, 4,999,900 USDT transferred from **SUBJECT VIRTUAL CURRENCY ADDRESS 17** to **SUBJECT VIRTUAL CURRENCY ADDRESS 19.** This transfer is included in **Graph Exhibit 16** as the aqua blue track.

245. On October 25, 2025, 4,999,900 USDT transferred from **SUBJECT VIRTUAL CURRENCY ADDRESS 17** to **SUBJECT VIRTUAL CURRENCY ADDRESS 31.**

a. This transfer funds two (2) transfers of 709,965.54662 and 134,889.974637 to **SUBJECT VIRTUAL CURRENCY ADDRESSES 29 and 30**, respectively, on October 25, 2025.

b. The transfer to **SUBJECT VIRTUAL CURRENCY ADDRESS 31** also funded a transfer of 929,906.49 USDT on October 25, 2025, to **SUBJECT VIRTUAL CURRENCY ADDRESS 28,** where it remained unspent.

246. Additionally funding **SUBJECT VIRTUAL CURRENCY ADDRESS 17,** on September 6, 2025, 2,384,654.857842 USDT transferred from a cryptocurrency Bridge service called USDT0 to VCA **0xc79899f171af14a24d18bade3d0e6205cfdd54b2** ("**54b2**"). "**54b2**" is the same VCA that paid the initial gas fees into **SUBJECT VIRTUAL CURRENCY ADDRESS 17.** The transfer commingled with other funds in "**54b2**" sourced to VCE Wintermute and a transfer of 4,818,500 USDT was sent to **SUBJECT VIRTUAL CURRENCY ADDRESS 17**.

a. From **SUBJECT VIRTUAL CURRENCY ADDRESS 17,** the transfer is commingled with other funds in a transfer of 7,700,000 USDT on September 6, 2025, to VCA **0x956161bc115c051374f5d2c7e441c81c230b3f63** ("**3f63**").

b. From "**3f63**" 5,999,900 USDT is transferred to **SUBJECT VIRTUAL CURRENCY ADDRESS 23** on September 8, 2025.

**<u>MOVEMENT OF FUNDS FROM CONSOLIDATION WALLET "29D3" TO SUBJECT VIRTUAL CURRENCY ADDRESS 23</u>**

247. As explained starting at paragraph 215, the transfers sourced to Thai nationals Mr. Praphatphong MAYURET, Mr. Tiptong MUKMONTREE, Mr. Wasin HOMSA ARD, Mr. Namkul VERAWAT, and Mr. Warut AMORNCHAILERDPATCNA, funded subsequent outgoing

withdrawals to **SUBJECT VIRTUAL CURRENCY ADDRESSES 17 - 31**. These Thai nationals are believed to be operating within the same scam group as PM and WJ based on the usage of the same consolidation wallet, **SUBJECT VIRTUAL CURRENCY ADDRESS 17** as well as the timing of PM's transactions into **SUBJECT VIRTUAL CURRENCY ADDRESS 17** just hours after the initial gas fees were paid. This suggests a coordinated effort to move the suspected ill-gotten gains to obfuscate the original source of the funds and launder the illicit proceeds.

248. As explained starting at paragraph 242, a significant portion of these transfers re-consolidated at consolidation address "**29d3**". Specifically, "**29d3**" received eight (8) transfers totaling 12,002,837 USDT sourced directly to Thai nationals and suspected criminal affiliates of PM: Mr. Praphatphong MAYURET, Mr. Tiptong MUKMONTREE, Mr. Wasin HOMSAARD, Mr. Namkul VERAWAT, and Mr. Warut AMORNCHAILERDPATCNA.

249. On October 24, 2025, after aggregating the deposits from VCAs "**9327**", "**e78e**", "**ce37**", "**2f2c**", and **SUBJECT VIRTUAL CURRENCY ADDRESSES 28 and 30,** two (2) transfers of 1,435,437 USDT and 12,705,730 USDT were conducted from consolidation address "**29d3**" to **SUBJECT VIRTUAL CURRENCY ADDRESS 23,** totaling 14,134,790 USDT, where the funds remained unspent. The transfers into **SUBJECT VIRTUAL CURRENCY ADDRESS 23** are included in **Graph Exhibit 16**, colored black.

250. In November 2024**, SUBJECT VIRTUAL CURRENCY ADDRESS 23** also received transfers through VCA **0x50467090cf51fc4603b81feff4d79a398dd952bc** ("**52bc**") which is connected to known scam consolidation address **0x0dc3fc3399d8e500205135bd2ee8360d93f421fb** ("**21fb**"). (See Paragraphs 141-144 for background information on consolidation address "**21fb**"). While transfers from "**21fb"** did not end up in **SUBJECT VIRTUAL CURRENCY ADDRESS 23**, the interconnected nature of these

addresses emphasizes the likelihood that each address is being operated by the same scam group and/or money laundering operation for the scam group.

251. VCA **"21fb"** was identified in this case previously (See paragraph 141) as a consolidation address shared by known bad actors PM and WJ. Specifically, PM and WJ sent over 2 million USDT to **"21fb"** from March to April 2025. Both PM and WJ are believed to have collectively sent over 50 million USDT in scam-related proceeds to various VCAs in a manner consistent with efforts to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the cryptocurrency investment fraud scheme.

## GAS FEE AND OWNERSHIP ANALYSIS FOR SUBJECT VIRTUAL CURRENCY ADDRESSES 17-31

252. Transfers of cryptocurrencies are subject to transaction costs. Each blockchain maintains its own manner of paying those costs. Transactions, including transfers conducted on the Ethereum blockchain, incur costs known as "gas" or "gas fees". For Ethereum transactions, gas fees must be paid in ETH, the native cryptocurrency of the Ethereum network. This includes transactions involving Ethereum network tokens, such as USDT, whose outgoing transfers would each require gas fees to be paid in ETH and cannot be paid using tokens. Therefore, a wallet address would need an ETH balance to initiate a sending transaction.

253. While it is possible that gas fees can be paid by a person other than the owner of the address initiating a transaction, in the circumstances described below the gas fee payments are probative of common control for four reasons. First, the addresses receiving the gas were newly created and had no prior transaction history. Second, in each instance the gas arrived shortly before, and directly enabled, the transfer of substantial sums of USDT: in the case of **SUBJECT VIRTUAL CURRENCY ADDRESS 17**, less than five hours before, and in the case of **SUBJECT VIRTUAL CURRENCY ADDRESS 28**, less than three hours before. Third, the

payments trace to a common origin rather than to unrelated sources. Fourth, the individual at the head of that funding chain, Worapat MONTHANOM, independently appears among the recipients of the Bitcoin that was subsequently transferred into **SUBJECT VIRTUAL CURRENCY ADDRESS 17**.

254. Gas fee analysis on **SUBJECT VIRTUAL CURRENCY ADDRESS 17** revealed that VCA **0xc79899f171af14a24d18bade3d0e6205cfdd54b2** (“**54b2**”) paid the initial gas fees for **SUBJECT VIRTUAL CURRENCY ADDRESS 17.**

a. VCA **0xb470091dc1cf11c5e68ebe8356a268f5297a5afd** (“**5afd**”) paid the initial gas fees for “**54b2”.**

b. VCA **0x2db81f845fcaa28a04ebe1922451c13bb1ebc6f8** (“**c6f8**”) paid the initial gas fees for “**5afd**”.

c. The first deposit into VCA “**c6f8**” was sent by Thai national, Worapat MONTHANOM via a Binance transfer. This same individual was also identified in records from VCE Binance as an owner of the VCAs involved in the Bitcoin “peel chain” that sourced these illicit transfers aggregated into **SUBJECT VIRTUAL CURRENCY ADDRESS 17.**

255. **SUBJECT VIRTUAL CURRENCY ADDRESS 17** conducted the first USDT deposit for VCA “**9327**” and **SUBJECT VIRTUAL CURRENCY ADDRESSES 18, 19, and 31.** See Graph Exhibit 16 for the usage of these VCAs.

256. Tracing of USDT from the VCEs consolidating into **SUBJECT VIRTUAL CURRENCY ADDRESS 17** and onward into **SUBJECT VIRTUAL CURRENCY ADDRESSES 18 – 31** shows multiple hops, reconsolidation, and movements that are consistent with money laundering efforts to hide the original source of the illicit funds. The methods

highlighted show that the activity in the VCAs appears to corroborate that the individual owners and/or operators of **SUBJECT VIRTUAL CURRENCY ADDRESSES 17 – 31** are operating within the group laundering the proceeds from the cryptocurrency investment fraud scheme.

257. Specifically, a Thai national, identified herein as DNR, claimed ownership of **SUBJECT VIRTUAL CURRENCY ADDRESSES 18-22 and 28-31**. However, the initial deposit of USDT for these addresses was conducted by **SUBJECT VIRTUAL CURRENCY ADDRESS 17,** which was claimed to be owned by another individual, a Thai national, hereafter known as PK**.** These deposits were directly funded by the transfers from the Thai nationals off-ramping funds from the "peel chain" believed to be sourced to the cryptocurrency confidence fraud scheme.

258. Further, transactions were conducted across multiple addresses all allegedly owned by the same individual, DNR. This is both illogical and inefficient when each move incurs its own transaction fee. By contrast, if the funds were going to the same individual, one would expect transfers for legitimate purposes to be accomplished in as few hops as possible—into a single address—to minimize transaction fees, even if these fees are fractional in value. Given the opportunity cost associated with the time to create these wallets, the time to transfer the native currency for gas funding, and the actual transaction cost, it does not behoove a legitimate business or individual to waste time or funds effectuating extraneous transfers, regardless of the amount.

259. Additionally, VCA "**9327**", introduced in paragraph 241, paid the initial gas fee for the second consolidation address, "**29d3**". VCA "**29d3"** paid the initial gas fee for **SUBJECT VIRTUAL CURRENCY ADDRESS 18.** DNR claimed ownership of **SUBJECT VIRTUAL CURRENCY ADDRESS 18.** Given the payment of gas fees, it is reasonable to conclude that VCAs "**9327**", "**29d3**" and **SUBJECT VIRTUAL CURRENCY ADDRESS 18** would be owned

or operated by the same individual or group. That conclusion is consistent with DNR's ownership claim to **SUBJECT VIRTUAL CURRENCY ADDRESSES 18-22 and 28-31**, which places nine of the fifteen addresses in this group in the control of a single person.

260. VCA"**29d3**'s" role appears to be for consolidating and aggregating the flow funds from seven (7) VCAs prior to final transfers into **SUBJECT VIRTUAL CURRENCY ADDRESS 23**. All of those funds are sourced to the transfers from the Thai nationals operating the peel chain.

261. Once the funds enter **SUBJECT VIRTUAL CURRENCY ADDRESS 17**, they are spread out among **SUBJECT VIRTUAL CURRENCY ADDRESSES 18-31** in a mostly circular manner, with some funds being parked in the VCAs and others consolidating, and reconsolidating, only to eventually route to **SUBJECT VIRTUAL CURRENCY ADDRESS 18** sometimes only hours after the VCA was created. Based on the interconnected nature of the transfers, 7 of the wallet addresses with the same claimed owner, and the timing of the transfers, there is reason to believe that the **SUBJECT VIRTUAL CURRENCY ADDRESSES 17 – 31** are operating in the same scam group. See **Graph Exhibit 16** for the flow of funds from **SUBJECT VIRTUAL CURRENCY ADDRESS 17,** taking multiple hops through into associated VCAs and consolidating into VCA **"29d3"** before routing to **SUBJECT VIRTUAL CURRENCY ADDRESS 23.**

262. Based on the intertwined nature of the transfers and ownership claims among the wallets transmitting what are believed to be illicit funds stemming from a cryptocurrency confidence fraud scheme and my training and experience, VCAs "**54b2**", "**5afd**", "**c6f8**", **"9327", "fb3d", "2f2c", "4efc", "e267"**, "**e78e**", "**f6e7**", consolidation address **"29d3",** and **SUBJECT VIRTUAL CURRENCY ADDRESSES 17-31** are likely controlled by the same individuals or

scam group that defrauded GM, DR, DC, IC, and EM. This is further emphasized by the fact that the Thai nationals sourcing the transfers to SVCAs 17-31 are linked with PM based on the usage of the same consolidation wallet, **SUBJECT VIRTUAL CURRENCY ADDRESS 17** as well as the timing of PM's transactions into **SUBJECT VIRTUAL CURRENCY ADDRESS 17** just hours after the initial gas fees were paid.

263. I was able to transactionally link PM to these individuals in the same way that PM was linked to scam consolidation address "**4acc**", which received and consolidated funds from victims GM, DR, DC, IC, and EM. PM was identified after she sent what are believed to be scam-derived funds through consolidation address "**4acc**"; and again PM sent funds through another consolidation address (**SUBJECT VIRTUAL CURRENCY ADDRESS 17**) linked to other individuals routing funds in a circular manner antithetical to legitimate business activity.

264. Several additional factors indicate that the transfers described above are part of a larger fraud scheme that includes other, unknown victims whose funds were laundered into the **SUBJECT VIRTUAL CURRENCY ADDRESSES**. First, in cryptocurrency confidence fraud schemes, victims are often given individual virtual currency addresses provided only to that particular victim; when a victim sends cryptocurrency to that individual address, the cryptocurrency is quickly sent to another address where funds from multiple victims are consolidated, and additional layers of consolidation addresses may also be used. That pattern is present here: the graph exhibits were created by back-tracing from the **SUBJECT VIRTUAL CURRENCY ADDRESSES** and the consolidation addresses identified when tracing the transactions of GM, DR, DC, IC, and EM, and the analysis of those victims' transactions showed their transfers sent to multiple wallets. Interviews with the victims also revealed that they were given a different wallet address for most of their deposits.

265. Second, based on my experience with cryptocurrency confidence fraud schemes, the perpetrators often operate multiple fraudulent investment platforms at once under different names, and register multiple domains for each platform, so that if one domain is shut down a backup can quickly be brought online and the new URL provided to victims. That is exemplified here, as each victim was provided or transferred to multiple different platforms over the course of the scheme.

## CONCLUSION

266. Based on the foregoing, there is probable cause to believe that the contents of the **SUBJECT VIRTUAL CURRENCY ADDRESSES** constitute, or are derived from, proceeds traceable to wire fraud / conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1343 and 1349 and are subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C); and/or were involved in concealment money laundering / conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h), or are property traceable to such property, and are subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A). The foregoing facts are also sufficient to support a reasonable belief that the United States will meet its burden of proof at trial that each of the **SUBJECT VIRTUAL CURRENCY ADDRESSES** should be forfeited.

267. Based on my training and experience, it is reasonable to believe that funds in the **SUBJECT VIRTUAL CURRENCY ADDRESSES** are proceeds of wire fraud. The funds transferred from the Thai-operated VCAs contained in the **SUBJECT VIRTUAL CURRENCY ADDRESSES** bear indicia of other cryptocurrency confidence investment schemes.

268. Specifically, these indicia include: 1) the movement of cryptocurrency from legitimate exchanges (like Binance or OKX) through multiple unhosted wallets which have transactional fees for each transaction made to a different wallet; 2) Cross-chain swaps that allow

users to trade tokens issued on one blockchain for tokens issued on a different blockchain (Bitcoin to Ether); 3) continued usage of consolidation addresses that directly received funds from cryptocurrency confidence fraud scheme victims; 4) multiple consolidation addresses used to combine smaller amounts and then transfer onward in larger increments; 5) intertwined transfers and connections to known fraudsters, PM and WJ; 6) the transfers completed are of identical or very similar amounts over a short period of time (sometimes as little as 24 hours); 7) IP address information geographically locates some of the individuals in the same locations (often operating from the same IP address); and 8) the usage of the same naming conventions for the creation of email accounts of the individuals utilizing the same IP addresses.

269. Based on my training and experience, I know that criminals will often conduct an otherwise unnecessary and costly number of transactions to layer ill-gotten funds to ultimately conceal or disguise the nature, location, source, ownership, or control of those proceeds. The large number of rapid transfers—with no apparent business purpose—in transactions throughout this case is a strong indication that the movement of funds was performed in a manner meant to conceal or disguise the nature, location, source, ownership, or control of the proceeds of a specified unlawful activity (in this case, wire fraud).

270. Further, it is reasonable to believe that the series of transfers through multiple wallets depositing into the **SUBJECT VIRTUAL CURRENCY ADDRESSES** constituted transactions in violation of 18 U.S.C. Section 1956(a)(1)(B)(i) (concealment money laundering). Under 18 U.S.C. Section 981(a)(1)(A), all property "involved in" or traceable to an offense in violation of Section 1956(a)(1)(B)(i) is subject to civil forfeiture.

271. With respect to the 18 U.S.C. Section 1956(a)(1)(B)(i) (concealment money laundering) violation, when "other funds" are commingled with traceable fraud proceeds all the

commingled funds are subject to forfeiture as all the funds were "involved in" the concealment money laundering conduct. While these "other funds" are likely to be other victims' money for the reasons stated above, even if they are not, they are nonetheless "involved in" the money laundering transactions to the extent they helped to conceal the nature, source, ownership, and/or control of the USDT traceable to WJ, PM, and/or other co-conspirators and thus are independently subject to forfeiture on that basis.

272. Based on my analysis of the flow of funds from this cryptocurrency confidence fraud scheme, the links between **SUBJECT VIRTUAL CURRENCY ADDRESSES** show that the **SUBJECT VIRTUAL CURRENCY ADDRESSES** are owned by or managed by the individual or individuals perpetrating the confidence fraud scheme outlined in this declaration, and the transactional activity through intermediary wallets and into the **SUBJECT VIRTUAL CURRENCY ADDRESSES** as established through blockchain analysis and tracing all bear common indicia of wire fraud and concealment money laundering. Therefore, probable cause exists to believe that the **SUBJECT VIRTUAL CURRENCY ADDRESSES** all contain proceeds of wire fraud, a specified unlawful activity, and that all the commingled funds contained therein from any source are subject to forfeiture as all the funds were "involved in" the concealment money laundering conduct.

Executed this 17th day of September 2026.

JOSEPH D CREMEENS
Digitally signed by JOSEPH D CREMEENS
Date: 2026.09.17 21:09:03 -04'00'

Special Agent Joseph D. Cremeens
Homeland Security Investigations

**GRAPH EXHIBIT 1**



## GRAPH EXHIBIT 2



# GRAPH EXHIBIT 3



## GRAPH EXHIBIT 4



**GRAPH EXHIBIT 5**



## GRAPH EXHIBIT 6



**GRAPH EXHIBIT 7**



**GRAPH EXHIBIT 8**



## GRAPH EXHIBIT 9



# GRAPH EXHIBIT 10



## GRAPH EXHIBIT 11



GRAPH EXHIBIT 12



## GRAPH EXHIBIT 13



## GRAPH EXHIBIT 14



## GRAPH EXHIBIT 15



## GRAPH EXHIBIT 16

